UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Soojung Jang, Ph.D.,

      Plaintiff,

      v.                                  Civil Action No. 2:17-cv-162-jmc

Trustees of St. Johnsbury Academy,
Kingdom Development Company, Inc.,

      Defendants.

**OPINION AND ORDER**
(Docs. 8, 11, 25)

On August 31, 2017, Plaintiff Soojung Jang, Ph.D., a citizen and resident of

Seoul, Republic of Korea, commenced this libel and defamation action against the

Trustees of St. Johnsbury Academy (the Academy) and Kingdom Development

Company, Inc. (KDC). (Doc. 1.) The Academy and KDC were part of a successful

effort to establish the St. Johnsbury Academy-Jeju on Jeju Island in the Republic of

Korea, which opened in late October 2017. (Doc. 8 at 7.) On July 16, 2016, prior to

the opening of the school, an attorney for the Academy and KDC sent a letter to the

Governor of the Jeju Provincial Office of Education detailing Dr. Jang's purported

efforts in the Republic of Korea and the United States to undermine the

establishment of the school. In Dr. Jang's Complaint, she claims that the letter's

contents are libelous and defamatory and that she suffered actual, special, and

punitive damages as a result of the letter's publication. (Doc. 1 at 4–5, ¶¶ 30, 34.)

Presently before the Court is the Academy and KDC's Joint Motion to Strike the Complaint pursuant to Vermont's anti-SLAPP statute, Vt. Stat. Ann. Tit. 12, § 1041 (2006), (Doc. 8), and their Joint Motion to Dismiss the Complaint for Failure to State a Claim pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. 11.) Dr. Jang responded in opposition to both motions, (Docs. 12, 15), and the Academy and KDC filed two replies. (Docs. 20, 21.) A hearing on the motions was held on February 20, 2018, and the parties subsequently filed supplemental memoranda. (Docs. 26, 27, 28, 30, 31, 32.)

Concluding that the evidence submitted by the Academy and KDC does not demonstrate that the letter involved a public issue under the Vermont Supreme Court's narrow interpretation of Vt. Stat. Ann. tit. 12, § 1041, the Court DENIES the Academy and KDC's joint Motion to Strike the Complaint. (Doc. 8.) Further, because Dr. Jang's Complaint does not plausibly allege claims for defamation or interference with a professional relationship, the Court GRANTS the Academy and KDC's Joint Motion to Dismiss for Failure to State a Claim. (Doc. 11.)

## Factual and Procedural Background

This Court has previously treated a motion to strike as analogous to a summary judgment motion under Federal Rule of Civil Procedure 65. *See Bible & Gospel Trust v. Twinam*, No. 1:07-cv-17, 2008 WL 5245644, at *1 (D. Vt. Dec. 12, 2008), *modifying report and recommendation*, 2008 WL 5216845 (D. Vt. July 18, 2008). As a result, in analyzing the Motion to Strike, the Court relies on the documents provided by the Academy and KDC in support of their Motion to Strike. (*See generally* Docs. 8, 8-1–8-24). In deciding the Academy and KDC's Motion to

Dismiss, the Court accepts as true the factual assertions stated in Dr. Jang's Complaint and the letter attached to the Complaint.[1]  *See Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 350 (2d Cir. 2003); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  (S*ee generally* Docs. 1, 1-1.)

## I.      Background and Parties

This case involves the establishment of a school on Jeju Island, a province in the Republic of Korea (South Korea).  Government-sponsored development on Jeju Island is controlled by the Jeju Free International City Development Center (the City Development Center), a corporation owned by the South Korean Ministry of Land, Transport, and Maritime Affairs.  (Doc. 8-2 at 5, § a; *see also* Doc. 1 at 2, ¶ 8.)  One of the City Development Center's projects is the Jeju Global Education City, a plan to create a "vibrant global education city" by establishing several international schools in a specific area on Jeju Island.  (Doc. 8-2 at 1, § b.)  To own and operate the international schools in the Global Education City, the City Development Center established Haewul, Inc., a wholly owned subsidiary of the City Development Center. (*Id.* at 1–2, § d; *see also* Doc. 1 at 2, ¶ 8.)

Dr. Jang is a resident of Seoul, South Korea, where she is a professor of general education.  She is a member of the Establishment and Operation of International Schools Subcommittee (the Establishment Subcommittee), a subcommittee of the Jeju Provincial Office of Education.  (Doc. 1 at 3, ¶ 23.)  Dr. Jang

---

[1]  For purposes of deciding the Academy and KDC's Motion to Dismiss, the Court solely relies on the facts set forth in Dr. Jang's Complaint and the Letter attached to the Complaint, not the documents submitted with the Motion to Strike.  *See Haywood v. St. Michael's Coll.*, Civil Action No. 2:12-cv-164, 2012 WL 6552361, at *16 n.25 (D. Vt. Dec. 14, 2012) ("To the extent the motion [to strike] disputes factual allegations in the Complaint, the Complaint's version of events controls.").

is also a member of Jeju Solidarity for Participatory Self Government and Environmental Preservation (Jeju Solidarity), a community organization focused on ensuring that the educational goals of the Global Education City are met. (Doc. 1 at 2, ¶¶ 9, 11, 12–13.)

The Academy operates a non-profit private school located in St. Johnsbury, Vermont, and owns a majority of stock in KDC, a Vermont for-profit corporation. (Doc. 1 at 1, ¶¶ 2, 3, 7; Doc. 8 at 2–3.)

## II. The Project and Dr. Jang's Initial Investigations

### A. Proposal and Cooperative Venture Agreement

In the spring of 2012, the City Development Center requested proposals for the establishment of a new international school in the Global Education City. (Doc. 8 at 2.) The Academy and KDC responded to this request, and the City Development Center ultimately proposed a joint venture with the Academy and KDC to establish and operate a new school known as St. Johnsbury Academy-Jeju (SJA-Jeju). (*Id.*) As a result, on November 29, 2012, the City Development Center, Haewul, the Academy, and KDC entered into a confidential cooperative venture agreement setting forth the terms of their joint project. (*Id.* at 4; *see generally* Doc. 8-2.)

By the agreement's terms, the City Development Center would appoint a developer to construct the school in the Global Education City and, upon construction of the school, sell or lease the building to Haewul. (Doc. 8-2 at 6, §§ e, g.) The Academy would grant Haewul a license to use the Academy's intellectual property rights in connection with the promotion and operation of SJA-Jeju and, in consideration, Haewul would pay royalties to the Academy. (*Id.* at 6, § h, *id.* at 14, §

9.3.)  Further, KDC would perform certain administrative and management functions for SJA-Jeju, such as ensuring that SJA-Jeju met the standards of the St. Johnsbury Academy in Vermont.  (*Id.* at 6, § i, *id.* at 12, § 5.)  In turn, Haewul would pay a management fee to KDC.  (*Id.* at 14, § 9.4.)

### B.      Further Review and Approval of SJA-Jeju

Although the City Development Center, Haewul, the Academy, and KDC had entered into the cooperative venture agreement, the project could not move forward without being approved by the Jeju Provincial Office of Education, the body charged with reviewing and approving schools in the Global Education City.  (Doc. 8 at 4.)  To this end, the Provincial Office of Education formed the Establishment Subcommittee, which was charged with reviewing and approving the SJA-Jeju project.  (*Id.*)  As noted above, at the relevant times, Dr. Jang was a member of this subcommittee. (*Id.*; Doc. 1 at 3, ¶ 23.)

### C.      China Daily and Korea Times Articles

On May 6, 2013, China Daily published an article describing the development on Jeju Island.  (*See generally* Doc. 8-11.)  The article generally described the City Development Center's mission to create a free international city like Hong Kong or Singapore.  (*Id.*)  Among the numerous projects described in the article, the article briefly noted that the City Development Center had formed partnerships with three international schools: North London Collegiate School; Branksome Hall; and St. Johnsbury Academy.  (*Id.*)  The article stated in passing that SJA-Jeju was expected to open in September 2015.  (*Id.*)  Similarly, an article in the Korea Times published on July 24, 2013, described the City Development Center's plan to

establish seven international schools on Jeju Island by 2021. (Doc. 8-12 at 2.) The article succinctly stated that three schools had already opened on a trial basis and that SJA-Jeju was expected to open in September 2015. (*Id.* at 2–3.) Neither article mentioned a public controversy surrounding the establishment of the schools, nor did the articles mention Dr. Jang.

### D. Dr. Jang's Presentation to the Establishment Subcommittee

SJA-Jeju was not yet open on January 15, 2016, when Dr. Jang submitted a "Summary of Preliminary Investigation" to the Provincial Office of Education and presented the information to the Establishment Subcommittee. (*See generally* Doc. 8-3; *see also* Doc. 8-1 at 3, ¶ 7.) Dr. Jang generally alleged in the summary that the relationship between KDC and the Academy was established to protect the Academy's non-profit tax status, that the Academy and KDC did not bear any risk if SJA-Jeju failed, and that the Academy and KDC lacked experience establishing and operating international schools. (Doc. 8-3 at 3–5.) She recommended further investigation by the Jeju Provincial Office of Education; in particular, she stated that the Office of Education should seek additional records relating to the business characteristics and tax status of KDC and the Academy. (*Id.* at 5–6.)

### E. Dr. Jang's Investigation in the United States

On February 1, 2016, Dr. Jang sought information regarding the governance of private schools from the National Association of Independent Schools (NAIS) in the United States. (Doc. 8-4 at 9–10.) In particular, Dr. Jang sought information regarding an independent school's procedures for approving "a franchised school in foreign country." (*Id.* at 9.) Attorney Debra Wilson, the Chief Counsel of NAIS,

responded to Dr. Jang's request and explained that the procedures depended on the school board and the school's structure and bylaws. (*Id.* at 8.) After further email correspondence with Dr. Jang regarding the specific business structure of the Academy and KDC and their relationship with SJA-Jeju, Attorney Wilson offered to reach out to the Academy and KDC on behalf of Dr. Jang. (*Id.* at 6.) As a result, Attorney Wilson investigated Dr. Jang's claims; according to the Academy and KDC, Attorney Wilson concluded in a February 10, 2016 letter that Dr. Jang's claims had no merit.[2] (Doc. 1-1 at 2, § a; Doc. 8-1 at 4, ¶ 10.)

### F.     Other Activities in Vermont Involving the Academy and KDC

At approximately the same time, in late January and early February 2016, the Academy and KDC claim that an unknown South Korean party contacted both the Vermont Department of Education and a private Vermont attorney. (Doc. 1-1 at 2, § b; Doc. 8-1 at 3, ¶ 8; Doc. 8-17 at 1, ¶ 2.) Allegedly, the unknown party requested help seeking documents relating to the cooperative venture agreement and the tax exempt status of the Academy. (Doc. 1-1 at 2, § b; Doc. 8-1 at 3, ¶ 8; Doc. 8-17 at 1, ¶ 2.)

### G.     Establishment Subcommittee Hearing[3]

At a February 18, 2016 hearing, the Establishment Subcommittee considered Attorney Wilson's letter, which allegedly stated that Attorney Wilson "had performed

---

[2] As support for this contention, the Academy and KDC rely on Doc. 8-5; however, the Court notes that this exhibit is a letter dated September 30, 2016, well after Attorney Wilson's investigation concluded. (Doc. 8-5 at 2.) Moreover, Doc. 8-5 merely confirms the existence of the February 10, 2016 letter, it does not describe any of the information contained in the February 10 letter. (*Id.*)

[3] It is not entirely clear whether this hearing occurred before the Establishment Subcommittee or the Office of Provincial Education. (*Compare* Doc. 1-1 at 2, § c, *with id.* § e.)

an independent review of the documentary material" and that "the process of entry into the [cooperative venture agreement was] legal and customary for member independent schools of NAIS." (Doc. 1-1 at 2, § c.) At the meeting, according to the Academy and KDC, Dr. Jang attempted to refute Attorney Wilson's letter, (*id.* § d); however, the subcommittee voted to reconfirm the cooperative venture agreement, which was to be signed by the Academy at a private trustee meeting on May 7, 2016. (*Id.* § e.)

## H.    Boston Korea Actions and Article

On May 7, 2016, during the Academy's private trustee meeting, two Boston Korea newspaper reporters disrupted the proceedings to pass out questions for the Academy trustees. (*Id.* at 3, § f.) Subsequently, on May 12, 2016, Boston Korea published an online editorial entitled "Open Letter to St. Johnsbury Academy" and an online article called "Public Questions Thrown at St. Johnsbury Academy." (Doc. 8-6 at 3–4, 6–7.) As interpreted by Google Translate, (Doc. 8-1 at 4, ¶ 11), the articles questioned the business relationship between the Academy and KDC, the business structure of KDC, and the academic qualifications of both St. Johnsbury Academy and SJA-Jeju. (Doc. 8-6 at 6–7.) Neither article named Dr. Jang.

## I.    Caledonian-Record Article and Ethan Allen Institute Post

On May 6, 2016, an article appeared in the Caledonian-Record, a newspaper located in St. Johnsbury, Vermont, describing the establishment of SJA-Jeju. (Doc. 8-13 at 1.) According to the article, contractors had begun work on the project on April 29, 2016, with an anticipated enrollment date in Fall 2017. (*Id.*) Further, the article generally described the anticipated academic programs, extracurricular

activities, and the student-body makeup.  (*Id.* at 1–2.)  Finally, the article concluded with a general description of Jeju Island.  (*Id.* at 2–3.)  Subsequently, in a post on the Ethan Allen Institute website on May 18, 2016, the writer described the contents of the Caledonian-Record article and commended South Koreans and the leadership of the Academy for establishing SJA-Jeju.  (Doc. 8-14.)  The articles neither mentioned Dr. Jang nor described an ongoing controversy involving the establishment of SJA-Jeju.

### J.      Legal Proceedings Against Dr. Jang in South Korea

At some time in May 2016, according to the Academy and KDC, Haewul initiated criminal and civil legal proceedings against Dr. Jang in South Korea, purportedly as a result of the events described above.[4]  (Doc. 8 at 6.)  Specifically, Haewul sought an injunction against Dr. Jang's unauthorized investigations and challenged her "misrepresentations and libelous statements concerning SJA Jeju, Haewul, Inc., and the project."  (*Id.*)  As discussed below, this investigation concluded over a year later, on June 23, 2017, when Dr. Jang signed a "Written Agreement," promising to cease interfering with the establishment of SJA-Jeju.  (Doc. 8-7 at 2.)

## III.   The Allegedly Defamatory Letter

On July 12, 2016, Attorney Bruce Palmer, representing the Academy and KDC, sent a letter (the Letter) to Lee Seok-moon, the Governor of Education for Jeju Island, and copied the Establishment Subcommittee on which Dr. Jang sat.  (*See*

---

[4]  The Academy and KDC do not explain how a civil party such as Haewul may bring a criminal action against a private citizen, nor do the Academy and KDC describe the general process of a civil and criminal investigation in South Korea.

*generally* Doc. 1-1.)  In the Letter, on behalf of the Academy and KDC, Attorney Palmer expressed a "deep concern[] about unauthorized and disruptive actions and false statements by Dr. Soonjung Jang, a member of the subcommittee of the Jeju Provincial Office of Education . . . charged with reviewing and approving [SJA-Jeju]." (Doc. 1-1 at 1.)  As a result, the Governor was asked to remove Dr. Jang from the subcommittee or, at the least, censure and disqualify Dr. Jang from "any further participation in or consideration of the approval of [SJA-Jeju]."[5]  (*Id.*)

As a basis for this recusal request, Attorney Palmer alleged that Dr. Jang, at every turn, "challenged the legality and legitimacy of [the Academy's] and KDC's efforts to participate in this project"; that Dr. Jang "attacked the validity of the Cooperative Venture Agreement"; that Dr. Jang "knowingly defamed [the Academy] and KDC in the process, alleging without any factual basis that each seeks through the [cooperative venture agreement] and other contracts to avoid paying taxes"; that Dr. Jang accused the Academy's headmaster and KDC's CEO of "illegally entering into the agreements without actual authority"; and that Dr. Jang repeatedly questioned the quality of the Academy.  (*Id.*)  According to the Letter, these actions and statements by Dr. Jang amounted to "an unjustified, concerted campaign of mistruth about [the Academy] and KDC . . . in a transparent effort to scuttle [SJA-Jeju]."  (*Id.* at 2.)

---

[5] It is unclear from the record what further approvals of SJA-Jeju were required.  As noted above, it appears that contractors had begun work on the project on April 29, 2016, prior to the Letter being sent to the Governor.  (Doc. 8-13 at 1.)  But, according to the Academy and KDC, the Provincial Office of Education did not fully approve SJA-Jeju until September 22, 2017.  (Doc. 8 at 7.)

Finally, counsel pointed out many of the events described above, including Dr. Jang's contact with Attorney Wilson and Attorney Wilson's subsequent independent review and approval of the cooperating venture agreement,[6] (*id.* at 2, §§ a, c); Dr. Jang's attempts to refute Attorney Wilson's analysis, (*id.* § d); and, the Establishment Subcommittee's subsequent vote reapproving the cooperative venture agreement. (*Id.* § e.) Attorney Palmer also intimated that Dr. Jang was responsible for the unknown South Korean's efforts to access the Academy's and KDC's records and that Dr. Jang was accountable for the investigation undertaken by Boston Korea and the subsequent articles. (*Id.* at 2, 3, §§ b, g.) In sum, counsel concluded that "[t]he campaign by Dr. Jang to impugn SJA and the integrity of its officials demonstrates her deep bias and disregard for traditional customs and laws" and "merit disqualification to serve on the [Establishment Subcommittee] responsible to review and approve the project." (*Id.* at 3.)

## IV. Subsequent Activities

### A. Email Communication by Dr. Jang

After the July 12, 2016 Letter was sent to the Governor, Dr. Jang continued to pursue her investigation of the SJA-Jeju project. On July 23, 2016, Dr. Jang emailed Attorney Wilson again, stating that the Academy and KDC were using Attorney Wilson's statements to rationalize their business activities. (Doc. 8-4 at 24.) Attorney Wilson referred her to Attorney Palmer, as counsel for the Academy and KDC. (*Id.* at 26.) Palmer responded to Dr. Jang's emails by referring her to

---

[6] The Court notes that, in the Letter, counsel described Dr. Jang's interaction with Attorney Wilson as occurring in February 2015. (Doc. 1-1 at 2, § a.) But given the other evidence in the record, (*see, e.g.*, Doc. 8 at 4; Doc. 8-4 at 9–10), it is clear that the correct date is February 2016.

Haewul's counsel and by prohibiting Dr. Jang from directly contacting the Academy and KDC.  (*See generally* Doc. 8-18.)

## B.      Legal Action by Jeju Solidarity

On September 22, 2016, an attorney representing Jeju Solidarity contacted the Academy and KDC seeking information relating to the Academy's relationship with KDC and the potential liability assumed by the Academy and KDC.  (Doc. 8-19 at 2–3.)  As noted above, Dr. Jang is a member of Jeju Solidarity, but she was not named in this correspondence.  (*See generally* Doc. 8-19; Doc. 1 at 2, ¶ 9.)  Counsel for the Academy and KDC referred the Jeju Solidarity attorney to Haewul.  (Doc. 8-19 at 2.)

On October 5, 2016, Attorney Jacob O. Durell, acting on behalf of Jeju Solidarity, sought information regarding the business relationship between the Academy and KDC as well as the liability purportedly assumed by the Academy and KDC.[7]  (*See generally* Doc. 8-20 at 4.)  Specifically, Durell asked to review a number of the Academy's and KDC's documents relating to the establishment of SJA-Jeju.  (*Id.*)  As authority for this request, the attorney cited Vt. Stat. Ann. tit. 11A, § 16.02, which authorizes a shareholder of a corporation to inspect the records of the corporation, and argued that the Academy and KDC's actions could lead to tort and consumer fraud claims.  (*Id.* at 5–6.)

On October 25, 2016, Jeju Solidarity filed suit in this Court, seeking declaratory relief and production of certain documents as well as alleging that the

---

[7] The Court notes that the new attorney was a member of the law firm currently representing Dr. Jang in this pending matter; however, Dr. Jang was not mentioned in any of the correspondence relating to the litigation pursued by Jeju Solidarity.

Academy and KDC committed consumer fraud. (Doc. 8-8 at 2, ¶ 7.) This lawsuit was voluntarily dismissed by Jeju Solidarity. *See Jeju Solidarity for Participatory Self-gov't & Envtl. Preservation v. St. Johnsbury Acad.*, No. 5:16-cv-00274-gwc, Doc. 6 (D. Vt. Nov. 5, 2016). Following this dismissal, on November 15, 2016, Jeju Solidarity again requested documents from the Academy and KDC. (Doc. 8-22.) On December 5, 2016, Jeju Solidarity sought injunctive relief against the Academy and KDC in Vermont state court, claiming that the Vermont's Public Records Act, as set forth in Vt. Stat. Ann. tit. 1, § 317, required the Academy and KDC to produce the requested records. (Doc. 8-9 at 6.) On March 3, 2017, the Vermont superior court granted the Academy and KDC's motion to dismiss, concluding that they were not public agencies subject to Vermont's Public Records Act. (Doc. 8-10 at 3.) Dr. Jang was not named as a party to either of these lawsuits.

### C. Dr. Jang's Written Agreement

On June 23, 2017, as noted above, following the investigation instigated by Haewul, Dr. Jang signed a "Written Agreement" directed to the Seoul Central District Prosecutor's Office in which Dr. Jang stated, "[I]t is not appropriate to express my opinion on the internet instead of committee meeting and such behavior may cause economic and/or administrative damage to [the Academy]." (Doc. 8-7 at 2.) She further agreed that she would "not do any negative activity against [Haewul] or SJA[-]Jeju through the internet including sending emails to parents individually or posting articles" and "not do any activity I have done so far such as submitting civil complaints." (*Id.*)

13

## V. Opening of SJA-Jeju

SJA-Jeju opened in mid-October 2017.[8]  (Doc. 8 at 7; Doc. 8-16.)  A news article in the Caledonian-Record described SJA-Jeju as "an independent, international boarding school established by the government of the Republic of South Korea using the SJA curriculum."  (Doc. 8-16 at 2.)  In addition, the article generally described the structure of the school, the campus, and the academic requirements.  (*Id.*)  The article did not mention Dr. Jang or any controversy regarding the establishment of SJA-Jeju.

## VI. Procedural History

### A. Dr. Jang's Complaint

On August 31, 2017, prior to SJA-Jeju's opening, Dr. Jang filed the Complaint in this case,[9] attaching the Letter to her Complaint and alleging that the Letter is "libelous and defamatory in that it maliciously claimed that the statements of [Dr. Jang] were unauthorized, disruptive, and false."  (Doc. 1 at 4, ¶ 30.)  She further claims that "[the Academy and KDC's] request that [Dr. Jang] be removed from the subcommittee was done willfully, wantonly, and recklessly to interfere with [Dr. Jang's] professional relationship with the subcommittee."  (*Id.* ¶ 31.)

As support for this claim, Dr. Jang asserts in her Complaint that Haewul made public representations that the Academy "would effectively be running [SJA-

---

[8]  The Academy and KDC state that SJA-Jeju opened on October 23, 2017, and, for support, they cite an article in the Caledonian Record.  (*See* Doc. 8 at 7.)  But that article, which is dated October 23, 2017, indicates that SJA-Jeju opened the week prior to October 23, 2017.  (Doc. 8-16.)

[9]  Dr. Jang's Complaint against the Academy and KDC was reported in the Caledonian-Record on September 22, 2017, (*see generally* Doc. 8-15); the article described the contents of the Letter and accurately reported Dr. Jang's claims and requested relief.  (*Id.*)

Jeju]," (*id.* at 2, ¶ 16), contrary to the Academy's purported representation that it would only be licensing its intellectual property without exercising control over SJA-Jeju. (*Id.* at 3, ¶¶ 18–19.) Based on this alleged contradiction, Dr. Jang states that she asked the Academy and KDC to provide documents clarifying their relationship, their control of SJA-Jeju, and their prospective liabilities for any potential failure of SJA-Jeju. (*Id.* at 3, ¶¶ 24–25.) She further alleges that the Academy and KDC refused her reasonable requests for records and instead, as a result of her "investigations and inquiries," caused their attorney to send the Letter to the Governor. (*Id.* at 4, ¶ 29.) Finally, she claims that the Letter's contents caused her significant injury, including "strong stigma" on her professional standing resulting in $500,000 of future losses, (*id.* ¶ 33), special damages of $115,000 in lost research funds, (*id.* at 5, ¶ 34, §§ c, d), professional condemnation from the other members of the Establishment Subcommittee, (*id.* ¶ 34, § b), and extreme emotional distress. (*Id.* ¶ 34, § e.)

## B.    The Academy and KDC's Motions

The Academy and KDC have filed two motions opposing Dr. Jang's claims. (Docs. 8, 11.) In their Joint Special Motion to Strike the Complaint pursuant to Vermont's anti-SLAPP statute, Vt. Stat. Ann. tit. 12, § 1041, (Doc. 8), the Academy and KDC argue that the Letter to the Governor involved a public issue and that, in sending the Letter, they were exercising their constitutional right to free speech and to petition the government. (Doc. 8 at 16.) They further argue that Dr. Jang cannot show that the Letter was devoid of reasonable factual support and arguable basis in

law or that the Letter caused her actual injury.  (*Id.*)  As a result, they contend that this Court should grant their Joint Motion to Strike.  (*Id.*)

In their Joint Motion to Dismiss for Failure to State a Claim under Federal Rule 12(b)(6), the Academy and KDC argue that the Complaint fails to set forth facts plausibly alleging the elements of defamation.  (Doc. 11 at 7–8.)  Specifically, they argue that the Letter's contents are pure opinion and, thus, not actionable, (*id.* at 8), that Dr. Jang does not allege that any of the statements in the Letter are false and defamatory, (*id.* at 10–11), that the Complaint fails to plead lack of privilege in the communication, (*id.* at 12), and that, because Dr. Jang is a public official or public figure, the Complaint fails to allege actual malice, as required by the First Amendment.  (*Id.* at 13.)  The Academy and KDC further allege that Dr. Jang's failure to allege actual malice precludes any recovery for infliction of emotional distress and punitive damages.  (*Id.* at 18–19.)

Dr. Jang opposes both motions.  (*See generally* Docs. 12, 15.)  In her opposition to the Motion to Strike, Dr. Jang argues that the Academy and KDC were addressing their grievances in South Korea, rather than under the United States or Vermont Constitutions, and asserts that the Academy and KDC had no factual basis for claiming in the Letter that Dr. Jang's actions were unauthorized and disruptive. (Doc. 12 at 1.)  Dr. Jang also argues in opposition to the Motion to Dismiss that she did not fail to plead that the Academy and KDC acted with malice and that the Letter's contents were false, pointing to her allegations in the Complaint that the Letter "maliciously claimed that the statements of [Dr. Jang] were unauthorized, disruptive and false when they were not" and that the request for removal was done

"willfully, wantonly and recklessly to interfere with [Dr. Jang's] professional relationship with the subcommittee." (Doc. 15 at 1 (internal quotation marks omitted).) Finally, Dr. Jang again claims that "most of [her] inquiries and investigations were what her committee had authorized her to do as a committee member." (*Id.* at 2.) In reply, the Academy and KDC argue that Dr. Jang's responses in opposition merely repeat her conclusory and insufficient allegations, (Doc. 20 at 1), and that their constitutional rights to free speech and to petition the government extend beyond the United States' borders. (Doc. 21 at 1–2.)

On February 20, 2018, this Court held a hearing on the motions. (Doc. 26.) Immediately prior to the hearing, Dr. Jang filed a Motion for Leave to File Affidavits.[10] (Doc. 25.) At the hearing, the parties generally reiterated the positions set forth in their motions. *See generally* Hearing Argument, *Jang v. Trustees of St. Johnsbury Acad. et al.*, No. 2:17–cv–162 (Feb. 20, 2018) (Conroy, Mag. J.). For the first time, however, Dr. Jang's attorney suggested that South Korean law could apply to the dispute, although Dr. Jang's attorney did not provide any evidentiary proof of this law. *Id.* at 2:03–2:06. In addition, upon questioning by this Court, Dr. Jang's

---

[10] In a separate document, the Academy and KDC oppose this motion, arguing that Dr. Jang failed to show excusable neglect. (*See* Doc. 31 at 1–2.) Dr. Jang disputes this contention, asserting that her Motion for Leave to File Affidavits did not prejudice the Academy and KDC because it only contained affidavits that had previously been filed under oath. (Doc. 32.) As the Court noted at the hearing, Dr. Jang's contention is correct: duplicates of these affidavits had previously been filed with Dr. Jang's Opposition to the Motion to Dismiss, although the previous affidavits had not been notarized. (*See generally* Doc. 15-1–15-3.) Thus, granting Dr. Jang's motion would not prejudice the Academy and KDC in any manner. *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003) (noting that "excusable neglect" is an elastic concept that, at bottom, involves an equitable determination). In any case, given the Court's conclusion that Dr. Jang's Complaint must be dismissed for failure to state a claim, her Motion for Leave to File Affidavits is DENIED as moot. (Doc. 25.).

counsel stated that the Complaint contained a claim for "interfere[nce] with . . . professional relationship."[11]  *Id.* at 3:02–3:03; (*see also* Doc. 1 at 4, ¶ 31.)  In light of these assertions by Dr. Jang's attorney, as well as new case law offered by counsel for the Academy and KDC, this Court provided the parties with the opportunity to provide supplemental memoranda.  (Doc. 26.)

In their supplemental memorandum, the Academy and KDC again assert that the anti-SLAPP statue, Vt. Stat. Ann. tit. 12, § 1041, requires this Court to strike Dr. Jang's lawsuit and, as additional support, argue that the Letter's publication in South Korea is protected by the Securing the Protection of our Enduring and Established Constitutional Heritage (SPEECH) Act, Pub. L. No. 111-223, § 1, 124 Stat. 2380, codified as 28 U.S.C. §§ 4101–4105.  (Doc. 30 at 1, 4.)  Further, the Academy and KDC assert that Dr. Jang failed to make out a claim for interference with profession.  (*Id.* at 6.)  By contrast, Dr. Jang claims that the Academy and KDC have failed to offer sufficient evidence to support the Motion to Strike, (Doc. 28 at 1), and that her Complaint plausibly makes out a claim for defamation.  (*See generally* Doc. 27.)  Dr. Jang does not offer additional argument regarding her claim for interference with professional relationship.  (*See generally id.*)

---

[11]  At the hearing, Dr. Jang's counsel waived any claim for intentional infliction of emotional distress.  Hearing Argument at 2:00–2:02, *Jang,* No. 2:17–cv–162.  Even if Dr. Jang did not waive this claim, the Court notes that the Complaint is devoid of any facts from which the Court can infer "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct."  *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296, 576 A.2d 441, 448 (1990) (internal quotation marks omitted).

<u>Analysis</u>

I.      **Choice of Law**

      A.      **Applicable Defamation Law**

Before addressing the substance of the Academy and KDC's motions, the Court must decide whether the law of South Korea or Vermont applies. As explained below, because neither party initially argued that South Korean law should apply nor provided evidence of that law, the Court concludes that the parties implicitly acquiesced to the application of Vermont law.

Because federal subject-matter jurisdiction in this case is based on diversity of citizenship, the Court must employ the choice-of-law analysis adopted by the forum state, in this case, Vermont law. *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) ("A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law."). For tort claims, such as defamation, Vermont follows the Restatement (Second) of Conflict of Laws to determine the applicable substantive law. *Amiot v. Ames*, 166 Vt. 288, 292, 693 A.2d 675, 677–78 (1997). Under the Restatement, the first step in the analysis "is to ascertain whether a specific section of the Restatement governs what law should ordinarily apply to the particular action or legal issue." *Martineau v. Guertin*, 170 Vt. 415, 417, 751 A.2d 776, 778 (2000). If so, that section applies; if not, the Restatement's general principles control, and the court applies the law of the state that "has the most significant relationship to the occurrence and the parties." Restatement (Second) of Conflict of Laws § 145(1) (1971). In that case, a multi-factor

test is employed to determine the state with the most significant relationship to the occurrence and parties, rather than a specific section of the Restatement. *Id.* § 6.

Defamation is governed by a specific section of the Restatement (Second), which provides: "In an action for defamation, *the local law of the state where the publication occurs determines the rights and liabilities of the parties*, . . . unless, with respect to the particular issue, some other state has a more significant relationship." *Id.* § 149 (emphasis added). Here, the state of most significant relationship appears to be South Korea because Dr. Jang was domiciled in South Korea at the time the Letter was published and the Letter was published in South Korea. (*See generally* Doc. 1-1.) Thus, the Restatement (Second) of Conflict of Laws and, by extension, Vermont law, seemingly call for the application of South Korean defamation law.

In this case, however, the parties principally briefed and presented arguments based on Vermont law. (*See generally* Docs. 8, 11, 12, 15.) Further, although Dr. Jang's counsel briefly suggested at the February 20, 2018 hearing that South Korean law might apply, counsel did not "give notice by a pleading or other writing" of his intent to raise an issue concerning South Korean defamation law. *See* Fed. R. Civ. P. 44.1 (stating that party intending to raise issue of foreign law must "give notice by a pleading or other writing"); *see In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 209 (2d Cir. 2003) (declining to apply foreign law where plaintiff offered no evidence of foreign law and no explanation for the extensive delay in raising this issue of foreign law). In such cases, the Second Circuit has concluded that the parties impliedly consent to the law of the forum state. *See Egiazaryan v. Zalmayev*, No. 11 Civ. 2670(PKC), 2011 WL 6097136, at *3 (S.D.N.Y. Dec. 7, 2011) (applying New York

defamation law where "the parties both present arguments based on New York law, the law of the forum state"); *see also Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) (concluding New York law should apply in lieu of Iranian law because parties' briefs relied on New York law and "implied consent to use a forum's law is sufficient to establish choice of law").

As a result, the Court concludes that, because all of the parties rely on Vermont law and the record contains no evidence of South Korean law, the parties have implicitly acquiesced to the application of Vermont defamation law.

## B. Extraterritoriality of the First Amendment

A related issue to the choice-of-law analysis is whether certain First Amendment protections apply extraterritorially to the Letter's publication in South Korea. The Court concludes that, under these specific circumstances—where no evidence in the record points to competing considerations in South Korean law or United States foreign policy and where the parties impliedly consent to the application of Vermont law—the First Amendment applies.

Both motions before the Court involve the intersection of First Amendment safeguards and defamation law. Vermont's anti-SLAPP statute, Vt. Stat. Ann. tit. 12, § 1041, protects "the defendant's exercise, in connection with a public issue, of the right to freedom of speech or to petition the government for redress of grievances under the U.S. or Vermont Constitution." *Id.* § 1041(a). Similarly, the Vermont Supreme Court has concluded, in applying U.S. Supreme Court precedent, that the

First Amendment requires a plaintiff bringing a defamation claim to establish that the defendant acted with "negligence, or greater fault," in addition to the common law defamation elements. *Lent v. Huntoon*, 143 Vt. 539, 546–47 n.1, 470 A.2d 1162, 1167–68 n.1 (1983) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)).

But it is an open question whether the First Amendment applies extraterritorially to protect an American citizen's commission of an alleged defamation abroad.[12] *See Desai v. Hersh*, 719 F. Supp. 670, 675 (N.D. Ill. 1989) ("[T]he applicability of first amendment protections to extraterritorial activities is uncertain."); *see also Haig v. Agee*, 453 U.S. 280, 308 (1981) (assuming, without deciding, "that First Amendment protections reach beyond our national boundaries . . ."); *Laker Airways Ltd. v. Pan Am. World Airways, Inc.*, 604 F. Supp. 280, 287 (D.D.C. 1984) ("It is less clear . . . whether even American citizens are protected specifically by the First Amendment with respect to their activities abroad; whether the petitioning of foreign governments is at all activity protected by United States law; and what United States constitutional protections aliens residing elsewhere may draw on when affected by American governmental action." (footnotes omitted)).

---

[12] In their supplemental memorandum, the Academy and KDC argue that the SPEECH Act, codified as 28 U.S.C. §§ 4101–4105, resolved this question. (Doc. 30 at 4–6.) But the plain language of the SPEECH Act belies this claim. The SPEECH Act prohibits a court in the United States from recognizing or enforcing a foreign judgment for defamation unless "the foreign court's adjudication provided at least as much protection for freedom of speech and press in that case as would be provided by the first amendment" or "the party opposing recognition or enforcement of that foreign judgment would have been found liable for defamation by a domestic court applying the first amendment." 28 U.S.C. § 4102(a)(1)(A), (B); *see also Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 487 (5th Cir. 2013) (concluding, under SPEECH Act, that Canadian defamation judgment could not be enforced in the United States). Thus, the SPEECH Act addresses whether a court may enforce or recognize foreign libel *judgments*, it does not address the extent to which the First Amendment protects a U.S. citizen's allegedly defamatory activities in a foreign country.

The few courts that have considered this question generally balance the foreign applicability of a United States citizen's First Amendment rights against the competing considerations of either the foreign country's relevant law or United States foreign policy. *See, e.g., Drummond Co., Inc. v. Collingsworth*, Case No. 13–mc–80169–JST (JCS), Case No. 13–mc–80171–JST (JCS), 2013 WL 6074157, at *14 (N.D. Cal. Nov. 18, 2013) ("[A]t the very least, a United States citizen's First Amendment rights should be recognized abroad in the absence of competing considerations."). For example, in *Desai v. Hersh*, the district court determined that due regard for the foreign country's own defamation laws should be weighed against two factors grounded in the First Amendment: (1) whether the speech involved an important matter of public concern in the United States; and (2) whether the defendants purposefully abandoned the protections of the First Amendment by intentionally publishing in a foreign country. 719 F. Supp. at 679–81; *see also DeRoburt v. Gannett Co.*, 83 F.R.D. 574, 579–80 (D. Haw. 1979) (applying First Amendment protections to alleged defamation that occurred in Nauru based on the relevant policies of the forum state, Hawaii, and the "justified expectations of the parties"). Ultimately, the court concluded that, because the allegedly libelous book concerned United States foreign policy, it involved a matter of public concern subject to extraterritorial First Amendment protections, "provided [the First Amendment's] protections [had] not been abandoned by the defendant through their intentional direct publication." *Desai*, 719 F. Supp. at 681.

In another case addressing the extraterritoriality of the First Amendment, *Bullfrog Films, Inc. v. Wick*, the district court analyzed whether the speech at issue "adversely affect[ed] foreign policy interests to such a degree that the speech [was] completely unprotected." 646 F. Supp. 492, 504 (C.D. Cal. 1986). As an example of speech that harmed foreign policy interests of the United States, the court referenced "speech [that] poses a clear and direct threat to national security." *Id.* Because no such national security interests were at stake, the court concluded that the First Amendment protected the foreign distribution of films that criticized the U.S. government. *Id.*

Here, the competing considerations identified by the courts in *Desai* and *Bullfrog Films* are not present to a degree that would justify depriving the Academy and KDC of their First Amendment rights. *See Drummond Co., Inc.*, 2013 WL 6074157, at *14. For example, the facts do not suggest that the Academy and KDC's reliance on First Amendment protections would threaten national security or undermine United States foreign policy. *See Bullfrog Films*, 646 F. Supp. at 504. Similarly, no evidence in the record indicates that the Academy and KDC purposefully abandoned the protections of the First Amendment when the Letter was sent to the Governor. *Desai*, 719 F. Supp. at 679. Indeed, the Academy and KDC partially rely on their First Amendment rights as a defense to Dr. Jang's defamation claims, further evidence that they have not abandoned their First Amendment protections. *See DeRoburt*, 83 F.R.D. at 580 (finding that First Amendment protections applied to defamation in foreign country in part because defendants were

sued in U.S. court and "defendants . . . therefore justifiably expect[ed] constitutional protection of their free expression").

Further, the parties have consented to the application of Vermont law. In *Amiot v. Ames*, the Vermont Supreme Court noted that, although Vermont's choice-of-law principles generally require the application of the state or nation's law where the most significant injury occurred, "there may be factors in an international case that would call for a different result." 166 Vt. at 292 n.2, 693 A.2d at 678 n.2 (citing Restatement (Second) of Conflict of Laws § 10). Specifically, the Vermont Supreme Court identified "American constitutional safeguards" as a factor that could call for a different outcome than the substantial-interest test. *Id.* Although not dispositive, the Vermont Supreme Court's suggestion that constitutional protections could be applied in lieu of another nation's laws provides further support for applying the protections of the First Amendment in this case, particularly given the dearth of evidence in the record establishing South Korean law.

In sum, the record contains no suggestion of competing considerations in either South Korea's defamation law or United States foreign policy and, moreover, the parties implicitly consented to the application of Vermont law. Accordingly, the Court concludes that the safeguards embodied in the First Amendment apply extraterritorially to the Letter's publication in South Korea.

## II.    Motion to Strike Under Vermont Anti-SLAPP Statute

The Court now considers the Academy and KDC's Joint Motion to Strike Dr. Jang's Complaint under Vt. Stat. Ann. tit. 12, § 1041, commonly referred to as

Vermont's "anti-SLAPP" statute.[13]  (*See* Doc. 8.)  The Court concludes that, under

recent Vermont precedent narrowly construing § 1041 and analogous California law,

the Academy and KDC have failed to adduce evidence demonstrating that the

Letter's contents constitute a public issue.  Accordingly, the Motion to Strike must be

DENIED.

### A.   Legal Standard

Anti-SLAPP statutes are intended to discourage litigants from "filing baseless

lawsuits known as Strategic Lawsuits Against Public Participation (SLAPP)."  Bruce

E.H. Johnson & Sarah K. Duran, *A View From the First Amendment Trenches:*

*Washington State's New Protections for Public Discourse & Democracy*, 87 WASH. L.

REV. 495, 496 (2012).  In such lawsuits, "[t]he strategy is to file weak claims with the

goal of silencing speakers because they fear the expense and travails of litigation."

*Id.*  Specifically, according to the Vermont Legislature, problematic SLAPPs are

"lawsuits brought primarily to chill the valid exercise of the constitutional rights of

freedom of speech and freedom to petition the government for the redress of

grievances."  2005, No. 134 (Adj. Sess.), § 1.  By freeing Vermont citizens from the

fear of reprisals and allowing speedy dismissal of meritless lawsuits, Vermont's anti-

SLAPP statute is meant to "encourage continued participation in matters of public

significance" and thereby guarantee robust public debate and discussion.  2005, No.

---

[13]  Although certain federal courts have declined to apply state anti-SLAPP provisions on the basis that such provisions conflict with the Federal Rules of Civil Procedure, *see, e.g.*, *Stuborn Ltd. Partnership v. Bernstein*, 245 F. Supp. 2d 312, 316 (D. Mass. 2003), this Court has previously held that an anti-SLAPP motion to strike may be brought in federal court, *see Bible & Gospel Trust*, 2008 WL 5245644 at *1 ("Vermont's anti-SLAPP statute, 12 V.S.A. § 1041, does not directly conflict with the Federal Rules of Civil Procedure.  12 V.S.A. § 1041 therefore applies in this diversity action.")

134 (Adj. Sess.), § 1; *see also Felis v. Downs Rachlin Martin PLLC*, 2015 VT 129, ¶ 29, 200 Vt. 465, 133 A.3d 836.

To accomplish this goal, § 1041 sets forth a two-step burden-shifting process. First, the defendant bringing the special motion to strike must make a threshold showing that the case arises from "the defendant's exercise, in connection with a public issue, of the right to freedom of speech or to petition the government for redress of grievances under the U.S. or Vermont Constitution." Vt. Stat. Ann. tit. 12, § 1041(a). A defendant's exercise of these rights includes four specific activities:

> (1) any written or oral statement made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;
>
> (2) any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;
>
> (3) any written or oral statement concerning an issue of public interest made in a public forum or a place open to the public; or
>
> (4) any other statement or conduct concerning a public issue or an issue of public interest which furthers the exercise of the constitutional right of freedom of speech or the constitutional right to petition the government for redress of grievances.

*Id.* § 1041(i). In applying these statutory categories, the Vermont Supreme Court has held that "the statute requires all actions to be 'in connection with a public issue[,]'" "regardless of the type of activity." *Felis*, 2015 VT 129, ¶¶ 35, 52.

Once the defendant meets his or her burden by demonstrating that the act is connected to a public issue and that the act fits one of the four protected categories, the burden shifts to the plaintiff. Vt. Stat. Ann. tit. 12, § 1041(e). At this stage, the court must grant the special motion to strike unless the plaintiff shows that "the

defendant's exercise of his or her right to freedom of speech and to petition was devoid of any reasonable factual support and any arguable basis in law[,] and . . . the defendant's acts caused actual injury to the plaintiff." *Id.* § 1041(e)(1). This determination is made on the basis of "the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." *Id.* § 1041(e)(2). If the plaintiff fails to meet this burden, and the court thus grants the special motion to strike, "the court shall award costs and reasonable attorney's fees to the defendant." *Id.* § 1041(f)(1). This award of costs and fees provides an added deterrent to the filing of SLAPPs and frees the defendants of the usual burden of costly defense of such lawsuits.

### B.      Application of § 1041 to the Letter

In applying § 1041, as noted above, this Court must first decide whether the Academy and KDC have satisfied their burden by demonstrating that the act is connected to a public issue. Section 1041 does not set forth the burden of proof that a defendant moving to strike must satisfy; however, in this Court, a special motion to strike is akin to a summary judgment motion under Fed. R. Civ. P. 56. *See Bible & Gospel Trust*, 2008 WL 5245644, at *1. As such, the Court views the evidence in the light most favorable to Dr. Jang and draws all reasonable inferences in Dr. Jang's favor. *See Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50 (1986)). This standard, assessed in light of recent Vermont precedent and analogous California law, compels the conclusion that the evidence submitted by the Academy and KDC does not establish that the Letter's contents constituted a public issue.

28

### 1. "Public Issue" Under Vermont Law

Like any case that calls for the application of Vermont law, this Court must apply § 1041 as the Vermont Supreme Court would apply it. *See Morse v. University of Vermont*, 776 F. Supp. 844, 850 (D. Vt. 1991). Along with requiring the allegedly defamatory content to be connected to a public issue, *Felis*, 2015 VT 129, ¶ 35, the Vermont Supreme Court has instructed that § 1041 should be narrowly construed and applied with great caution. *Id.* ¶ 41. Given this guidance, the Court cannot strike Dr. Jang's Complaint under § 1041 because the record does not establish that the Letter addressed a public issue rather than a private business dispute.

Since the enactment of § 1041, the Vermont Supreme Court has authoritatively interpreted the statute on one occasion, in *Felis v. Downs Rachlin Martin PLLC*, 2015 VT 129, ¶ 35. In *Felis*, the Supreme Court held that, to be protected by § 1041, the activity must be "'in connection with a public issue.'" *Id.* ¶ 52. In other words, although the language of § 1041(i)(1) and § 1041(i)(2) does not specifically limit protected activities to those connected to a "public issue," that requirement has been judicially imposed for all subsections of § 1041(i). This requirement departed from this Court's previous decision in *Ernst v. Kauffman* (*Ernst I*), which came to the opposite conclusion. 50 F. Supp. 3d 553, 558–59 (D. Vt. 2014) (concluding that that a defendant did not need to demonstrate that a statement concerns a public issue under § 1041(i)(1) and (2)). In *Felis*, the Vermont Supreme Court acknowledged that the *Ernst I* analysis was more consistent with the statute's language and the California Supreme Court's interpretation of a similar anti-SLAPP statute. *Felis*, 2015 VT 129, ¶ 38. Still, the Vermont Supreme Court

concluded that "[a] number of weighty considerations" supported the imposition of a "public issue" requirement for all actions under § 1041. *Id.* ¶ 39.

In particular, the Supreme Court evinced concern about liberally construing the anti-SLAPP statute because the statute attempts "to define the proper intersection between two constitutional rights—a defendant's right to free speech and petition and a plaintiff's right to petition and free access to the courts." *Id.* ¶ 41. Because of these competing constitutional concerns, the Vermont Supreme Court concluded that "the anti-SLAPP statute should be construed as limited in scope and that great caution should be exercised in its interpretation."[14] *Id.*

As support, the Supreme Court noted that those states that do not limit their anti-SLAPP statutes to "public issues," like California and Texas, had been overwhelmed by anti-SLAPP litigation and that sophisticated litigants in those states often used anti-SLAPP actions to elevate common civil claims to constitutionally protected actions. *Id.* ¶¶ 49–50. According to the Supreme Court, the Vermont Legislature could not have intended such an "expansive use of the anti-SLAPP remedy in circumstances far afield from the paradigm on which the statute

---

[14] In their supplemental memorandum, the Academy and KDC argue in a footnote that this statement is "non-binding dictum" because the statement was broader than necessary to resolve the issue in *Felis*. (Doc. 30 at 3–4 n.2 (citing *Schulman v. Saloon Beverage, Inc.*, 991 F. Supp. 2d 501, 507 (D. Vt. 2014)). But clearly the Vermont Supreme Court's decision to limit the scope of § 1041 was essential to the resolution of the question before the Court. As the Vermont Supreme Court recognized, the plain language of § 1041 does not require a defendant to "demonstrate that a statement concerns a public issue" if the statement was made before "a legislative, executive, or judicial proceeding." *Felis*, 2015 VT 129, ¶¶ 35, 38 (citing § 1041(i)(1)). Given the Supreme Court's determination that "the anti-SLAPP statute should be construed as limited in scope," *id.* ¶ 41, however, the Supreme Court looked beyond the statute's plain language and required all activities protected by § 1041 to concern a public issue. *Id.* ¶ 39. Specifically, in *Felis*, this narrow interpretation resulted in the Supreme Court's conclusion that the defendant's testimony during divorce proceedings was not an activity connected to a public issue and, thus, was not protected by § 1041. *Id.* ¶ 53. Absent the Supreme Court's decision to narrowly construe § 1041, the court could not have reached this holding.

was based." *Id.* ¶ 51. That is, the Legislature intended to prevent one side of a public debate from misusing the court system to unilaterally control an issue and, in particular, to prevent those with extensive financial resources from intimidating and silencing citizen participants. *Id.* ¶¶ 47, 48. As a result, to limit the overuse of § 1041 as a remedy, the Vermont Supreme Court concluded that all motions to strike must be based on protected activity connected to a public issue. *Id.* ¶ 52.

After *Felis*, the plaintiffs in *Ernst I* moved for reconsideration in this Court, arguing that *Felis* constituted an intervening change in controlling law that changed the *Ernst I* outcome. *See generally Ernst v. Kauffman*, Case No. 5:14-cv-59, 2016 WL 1610608, *4 (D. Vt. Apr. 20, 2016) (*Ernst II*). The defendants argued that *Felis* did not change the outcome because their allegedly defamatory statements and letter concerned the public interest, specifically pointing to the plaintiffs "involve[ment] in the community debate over school unification and local zoning matters." *Id.* at *6. But this Court concluded that the statements and letter "describe[ed] largely personal behavior" of the plaintiffs and that the defendants had failed to make "a specific showing that the statements alleged to be defamatory addressed issues of public interest." *Id.* As support for this conclusion, this Court noted that, "[a]fter *Felis*, it is insufficient to argue only that the statements were made in a public forum or that they concerned people active in public life. [The] [d]efendants plainly have the burden of proving that the specific statements they made were public in nature." *Id.*

In this case, although the facts of *Felis* and *Ernst II* are not analogous, the Court draws several conclusions from the analysis in both cases. First, as a general

matter, the present case does not involve the power dynamics the Vermont Supreme Court found to be one of the concerns addressed by § 1041. *Felis*, 2015 VT 129, ¶¶ 47, 48. Here, all of the parties are represented by counsel and, given the extended litigation described in the record, neither party has been intimidated or silenced by the extended litigation. *Cf. id.*; (*see also* Docs. 8-8–8-10.) Similarly, the Academy and KDC are not part of the definitive class protected by § 1041. *See Felis*, 2015 VT 129, ¶ 30 (explaining that "[Vermonters] have been sued for testifying before their city councils, zoning commissions, and school boards and for reporting violations of environmental laws to regulatory agencies." (quotation omitted)). The Academy and KDC are not concerned citizens; instead, they have a business interest in the approval and establishment of SJA-Jeju. *Cf. id.*; (*see also* Doc. 8-2 at 14, §§ 9.3–9.4.)

More important, a review of the Letter's contents and the other evidence in the record demonstrates that the Academy and KDC were focused on protecting those business interests, rather than addressing a public issue. (*See generally* Doc. 1-1; Docs. 8-1–8-24.) Specifically, the Academy and KDC were concerned that Dr. Jang's actions exhibited bias that would negatively influence the review and approval of SJA-Jeju and asked the Governor to remove Dr. Jang from the committee. (*See* Doc. 1-1.) Nothing in the Letter suggests that the Academy and KDC were voicing their opinions as part of a public dispute or that the Letter's description of Dr. Jang's personal actions concerned broad issues of public interest. *Cf. Felis*, 2015 VT 129, ¶ 30; *Ernst II*, 2016 WL 1610608, at *6. Indeed, no competent evidence shows that the committee's deliberations were open to the public or that the Academy and KDC distributed the Letter outside of the Establishment Subcommittee. *Cf. Ernst II*, 2016

WL 1610608, at *6 ("[The] [d]efendants plainly have the burden of proving that the specific statements they made were public in nature.") Similarly, the record does not contain evidence of general public interest in the establishment of SJA-Jeju or Dr. Jang's involvement on the committee. Although the Academy and KDC submitted several news articles that generally describe the Global Education City and, in passing, mention SJA-Jeju, (*see* Docs. 8-11–8-14), only one article names Dr. Jang and describes a potential controversy with the establishment of SJA-Jeju. (Doc. 8-15.) That article was published in response to the case presently before this Court, not as a result of general public interest in the founding of SJA-Jeju or in the Letter's contents. In sum, after *Felis*, this evidence is not specific enough to show "that the statements alleged to be defamatory addressed issues of public interest." *Ernst II*, 2016 WL 1610608, at *6.

The lack of evidence in this case contrasts starkly with *Dongguk University v. Yale University*, upon which the Academy and KDC placed great reliance at the February 2018 hearing before this Court. Hearing Argument at 2:08–2:10, 2:18–2:21, *Jang*, No. 2:17–cv–162 (referencing *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 118 (2d Cir. 2013)). In that case, Dongguk University hired a professor after Yale University incorrectly vetted and confirmed the professor's ersatz academic credentials. *Dongguk Univ.*, 734 F.3d at 118. Upon discovering the professor's fraudulent qualifications, Dongguk initiated an investigation of the hiring, which led Dongguk to partially blame Yale. *Id*. at 117–19. Yale strenuously denied any fault. *Id*. at 119–21. Multiple print and television outlets in the South Korean media reported on the dispute between the universities, criticizing Dongguk's hiring

practices and quoting representatives of Yale. *Id.* at 119–20. These media statements by Yale ultimately triggered Dongguk's defamation claim. *Id.* at 121–22. In other words, the record in *Dongguk* contained numerous media reports evidencing clear public statements by both parties and specifically showing "that the statements alleged to be defamatory addressed issues of public interest." *Ernst II*, 2016 WL 1610608, at *6. By contrast, the evidence in this case neither establishes that the contents of the Letter "were public in nature" nor specifically shows that the statements addressed an issue of public interest. *Id.*

Moreover, the analysis in *Dongguk University* did not involve the application of an anti-SLAPP statute to purportedly defamatory statements; instead, *Dongguk University* involved the First Amendment safeguards relevant to Dongguk's common law defamation claims. *Dongguk Univ.*, 734 F.3d at 122–23. Here, of course, the Academy and KDC still retain their First Amendment protections as a shield against Dr. Jang's defamation claims. *Ernst II*, 2016 WL 1610608, at *6. But, based on the record before this Court, their effort to strike the lawsuit under § 1041 fails, particularly given the Vermont Supreme Court's instruction that § 1041 should be narrowly construed. *Felis*, 2015 VT 129, ¶ 41.

## 2. "Public Issue" Under California Law

This Court draws further support for this conclusion from California law, which contains an anti-SLAPP statute substantially similar to § 1041. In particular, the Court concludes that the Academy and KDC have not adduced sufficient evidence demonstrating that the Letter involves a "public issue" under the three-factor test

employed by California's appellate courts. Thus, the Academy and KDC fail to satisfy the threshold requirement that the Letter's publication to the Governor was "'in connection with a public issue.'" *Felis*, 2015 VT 129, ¶ 52 (quoting Vt. Stat. Ann. tit. 12, § 1041(a)).

Since *Felis*, the Vermont Supreme Court has not published any controlling precedent interpreting § 1041(a) or further defining the judicially imposed "public issue" requirement.[15] Nor does the statute itself define "public issue." *See generally* Vt. Stat. Ann. tit. 12, § 1041. Given this paucity of authoritative law, the Court's analysis in this case also rests on persuasive authority from other jurisdictions interpreting analogous anti-SLAPP statutes and any other "sources on which [Vermont's] highest court might rely." *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 71 (2d Cir. 2000). For this purpose, the Court relies in large part on the decisions of California's appellate courts, given that California's anti-SLAPP statute is substantially similar to Vermont's. *Compare* Cal. Code of Civ. Proc. § 425.16, *with* Vt. Stat. Ann. tit. 12, § 1041; *see also Felis*, 2015 VT 129, ¶ 31 ("Vermont's statute was based primarily on the language of California's 1992 statute, but also contains language from the Massachusetts statute."). In analyzing this

---

[15] After *Felis*, the Vermont Supreme Court has issued three nonprecedential entry orders addressing § 1041(a). In one, the Supreme Court determined that § 1041(a) protected the defendant's newspaper article, which described the plaintiff's criminal charges arising out of public confrontations. *Chandler v. Rutland Herald Publ'g*, No. 2015-265, 2015 WL 7628687, at *1 (Vt. Nov. 19, 2015). In another, the Court concluded that § 1041(a) safeguarded the defendant's letter to a newspaper suggesting the plaintiff was unfit for office, *Bock v. Smith*, No. 2017-176, 2017 WL 5989987, at *1 (Vt. Dec. 1, 2017). Finally, in the last decision, the Supreme Court concluded that the trial court did not abuse its discretion in awarding attorney's fees under § 1041(f). *Chandler v. Rutland Herald Publ'g*, No. 2016-136, 2016 WL 4472395, at *1 (Vt. Aug. 23, 2016).

precedent, however, the Court remains mindful that, in Vermont, unlike California, "the anti-SLAPP statute should be construed as limited in scope and that great caution should be exercised in its interpretation." *Compare Felis*, 2015 VT 129, ¶ 41, *with Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1121, 969 P.2d 564, 574 (1999) (concluding the anti-SLAPP statute should be broadly applied).

With that important limitation in mind, the Court turns to California law, which requires the moving party to make a prima facie showing that the plaintiff's cause of action involved a public issue. *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 897–98, 17 Cal. Rptr. 3d 497, 5005–06 (2004). Three factors set forth by the California appellate courts are relevant to determining if a statement or conduct concerned an issue of public interest:

> whether (1) the subject of the statement or activity precipitating the claim was a person or entity in the public eye; (2) [whether] the statement or activity precipitating the claim involved conduct that could affect large numbers of people beyond the direct participants; and (3) whether the statement or activity precipitating the claim involved a topic of widespread public interest.

*Id.* at 898, 17 Cal. Rptr. 3d at 506; *see also Ernst I*, 50 F. Supp. 3d at 561 (setting forth the factors). The Court addresses each factor in turn, ultimately concluding that the evidence in the record does not show that the Letter's contents involved a "public issue."

### a. Person or Entity in Public Eye

First, the record does not demonstrate that Dr. Jang is a person or entity in the public eye.

As previously recognized by this Court, "the standard for determining whether a person is 'in the public eye' appears to be similar if not identical to the standard for determining whether a person is a 'public figure' under First Amendment defamation law." *Ernst I*, 50 F. Supp. 3d at 561 (citing *Sipple v. Found. for Nat'l Progress*, 71 Cal. App. 4th 226, 83 Cal. Rptr. 2d 677, 684–85 (1999)). Under that constitutional standard, either a person may be a general-purpose public figure who, by dint of their "pervasive fame or notoriety," becomes a public figure in all contexts or a person may be a limited-purpose public figure who "voluntarily inject[ed] himself or herself into a particular public controversy and thereby [became] a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351. In the Second Circuit, to establish that a plaintiff is a limited-purpose public figure, the defendant must show that a plaintiff has:

> (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Biro v. Condé Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013) (quoting *Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123, 136–37 (2d Cir. 1984).

In the alternative, a public official may be in the "public eye" if he or she is "among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). To be in that hierarchy of government officials, the public must have a specific and independent interest in the qualifications of the public official, "beyond the general public interest in the

qualifications and performance of all government employees." *Id.* at 86; *see Bufalino v. Associated Press*, 692 F.2d 266, 274 (2d Cir. 1982) (concluding plaintiff was not a public official where the record did not show the degree to which the public recognized plaintiff by name, "as the holder of a public office").

Here, the Academy and KDC do not argue, nor could they, that Dr. Jang is a general-purpose public figure. Instead, they claim that Dr. Jang is in the public eye because she is both a limited-purpose public figure and a public official. As support, they point to Dr. Jang's involvement in the Establishment Subcommittee charged with reviewing and approving SJA-Jeju. (Doc. 8 at 11.) They further argue that, "[Dr. Jang] very publicly inserted herself into the debate over the appropriateness of SJA Jeju's approval." (*Id.*) But neither claim is supported by the evidence.

First, the news articles submitted by the Academy and KDC do not suggest that the public in South Korea or Vermont knew of Dr. Jang's attempts to influence the alleged controversy surrounding the approval of SJA-Jeju. Indeed, as noted above, the only news article to mention Dr. Jang by name was published after the initiation of this lawsuit and after the Letter's publication in South Korea. (*See* Doc. 8-15.); *cf. Ernst I*, 50 F. Supp. 3d at 561–62 ("[T]here is no evidence that those disputes were a matter of public interest or controversy at the time the statements were made."). The remaining articles neither mention Dr. Jang by name nor describe her involvement in the establishment of SJA-Jeju or the Jeju Provincial Office of Education. (*See* Docs. 8-11–8-14.) Similarly, the other documents in the record do not suggest that her actions placed her in the public eye in either Vermont or South

Korea; instead, they show that Dr. Jang conducted essentially private inquiries.[16] (*See* Doc. 8-3 at 3; Doc. 8-1 at 3, ¶ 7; Doc. 8-4 at 21.)  In short, although it is clear that Dr. Jang did not approve of SJA-Jeju, neither the news articles nor the other documents submitted suggest that Dr. Jang "successfully invited public attention to [her] views," that she "assumed a position of prominence in the public controversy," or that she "maintained regular and continuing access to the media."  *Cf. Biro*, 963 F. Supp. 2d at 270.

The only evidence possibly suggesting that Dr. Jang's actions thrust her into the public eye is the "Written Agreement" in which Dr. Jang promised to forgo "negative activity against . . . SJA Jeju" on the internet and to stop "providing information to Media," presumably regarding SJA-Jeju.  (Doc. 8-7.)  But Dr. Jang executed the agreement on June 23, 2017, well after the Academy and KDC sent the Letter to the Governor.  (Doc. 8-1 at 4, ¶ 12.)  In other words, the Written Agreement does not show that Dr. Jang's actions were in the public eye at the time the Letter was published.  *Cf. Ernst I*, 50 F. Supp. 3d at 561–62.  Thus, the Written Agreement cannot support a conclusion that Dr. Jang was a limited-purpose public figure who thrust herself into a public controversy.  *See Grossman v. Smart*, 807 F. Supp. 1404,

---

[16]  The Court does not credit the lawsuits initiated by Jeju Solidarity or the activities of the Boston Korea reporters as evidence that Dr. Jang thrust herself into a public controversy.  First, no evidence in the record connects Dr. Jang with the Boston Korea reporters.  (*See generally* Doc. 8-6.)  Second, although Dr. Jang admits to being a member of Jeju Solidarity, (Doc. 1 at 2, ¶ 9), the record does not establish that Dr. Jang was a party to any of the lawsuits filed in Vermont prior to the present case before the Court.  (*See* Docs. 8-8, 8-9, 8-10.)  Moreover, a person participating in a proceeding in public court does not necessarily become a limited-purpose public figure, *cf. Biro v. Condé Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013), nor does a court proceeding automatically become a matter of public interest.  *See Time, Inc. v. Firestone*, 424 U.S. 448, 457, (1976) (stating constitutional limitations on defamation law "cannot be justified by generalized references to the public interest in reports of judicial proceedings").

1410 (C.D. Ill. 1992) (concluding that plaintiff was not a public figure where defendant did not identify a particular public controversy involving plaintiff prior to the alleged defamatory publications); *Gallagher v. Connell*, 123 Cal. App. 4th 1260, 1272–73, 20 Cal. Rptr. 3d 673, 682–83 (2004) (concluding diocesan priest was not a limited-purpose public figure where nothing in the record demonstrated a public controversy prior to publication of news article). The record before the Court is clear: the public did not know either of Dr. Jang or her purported attempts to scuttle the SJA-Jeju project.

Further, the record does not show that Dr. Jang was a public official with "substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt*, 383 U.S. at 85. While it is true that Dr. Jang was a member of the Establishment Subcommittee charged with reviewing and approving SJA-Jeju, (*see* Doc. 8 at 11), no evidence substantiates Dr. Jang's control over the subcommittee's decision-making process or, indeed, the exact nature of her decision-making authority on the subcommittee. *Compare Grossman*, 807 F. Supp. at 1409 (concluding plaintiff was not a public figure where facts did not establish plaintiff's decision-making authority), *with Palmer v. Bennington Sch. Dist., Inc.*, 159 Vt. 31, 38, 615 A.2d 498, 502 (1992) (concluding school principal was a "public official" based on principal's own admissions as to his authority). In fact, despite Dr. Jang's vociferous objections to SJA-Jeju, the subcommittee eventually approved the project, demonstrating her lack of control. Similarly, the record does not contain evidence of the public's independent interest in Dr. Jang's qualifications as a member of the

subcommittee or the public's awareness of Dr. Jang's role on the subcommittee. *Rosenblatt*, 383 U.S. at 86; *Bufalino*, 692 F.2d at 274.

In sum, the Academy and KDC's argument that Dr. Jang's status as a limited-purpose public figure or public official placed her in the public eye is not supported by evidence in the record. Absent clear evidence, the Court remains mindful that § 1041 should be construed as limited in scope, *Felis*, 2015 VT 129, ¶ 41, and, as a result, concludes that Dr. Jang was not in the public eye.

### b.      Effect of the Letter Beyond Direct Participants

Under the second factor, the Academy and KDC argue that the Letter adversely affected prospective students of SJA-Jeju and their parents. Although this argument has some theoretical merit, it is not supported by the record.

"[A] matter of public interest should be something of concern to a substantial number of people." *Wilson v. Cable News Network, Inc.*, 6 Cal. App. 5th 822, 832, 211 Cal. Rptr. 3d 724, 732 (Ct. App. 2016). If the information concerns only the speaker and "a relatively small, specific audience [the information] is not a matter of public interest." *Id.* To be of concern, the information contained in the statement or activity must have "intrinsic value to others," it cannot be merely informational. *Rivero v. Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO*, 105 Cal. App. 4th 913, 925, 130 Cal. Rptr. 2d 81, 91 (2003). Where the issue does not interest a substantial number of the public, the information must be connected to an ongoing controversy, dispute, or discussion to warrant protection under the anti-SLAPP statute. *Compare Du Charme v. Int'l Bhd. of Elec. Workers, Local 45*, 110 Cal. App. 4th 107, 119, 1 Cal. Rptr. 3d 501, 510 (2003) (concluding that website post detailing plaintiff's

41

termination for financial misconduct was *fait accompli* that did not encourage union members to publically debate the termination), *with Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 472, 102 Cal. Rptr. 2d 205, 207 (2000) (holding that, because publications in local, community newsletter criticizing manager were part of ongoing debate over the management of the homeowner's association, the information affected a significant number of people).

Here, it is conceivable that the Letter's information could have adversely affected prospective students of SJA-Jeju and their parents, as the Academy and KDC argue. (Doc. 8 at 11.) On the other hand, no evidence in the record supports this purported impact and, more important, no evidence demonstrates that the prospective students and their parents were participating in an "ongoing controversy, dispute, or discussion" involving Dr. Jang and the establishment of SJA-Jeju. *Du Charme*, 110 Cal. App. 4th at 119, 1 Cal. Rptr. 3d at 510. Instead, the only direct evidence points to the Letter's limited distribution to the Governor and the Establishment Subcommittee; that is, the direct evidence suggests that the Letter was intrinsically valuable only to "a relatively small, specific audience." *Cf. Wilson*, 6 Cal. App. 5th at 832, 211 Cal. Rptr. 3d at 732.

Similarly, there is some notional merit to the Academy and KDC's claim that the citizens of Vermont and South Korea have a vested interest in an "educated citizenry." (Doc. 8 at 11–12; Doc. 30 at 3.) But again, the record does not support this argument in relation to SJA-Jeju. For example, the information in the Letter was of little intrinsic value to Vermonters; plainly, the establishment of SJA-Jeju had little influence on the educated citizenry of Vermont. Further, nothing in the Letter

suggests that Dr. Jang's conduct affected broad educational concerns in South Korea. Instead, the Letter describes Dr. Jang's personal efforts to investigate SJA-Jeju and requests her removal. (*See generally* Doc. 1-1.) Absent specific evidence that Dr. Jang's actions generally implicated the whole of South Korea's educational system, the Academy and KDC's reliance on the amorphous concept of an "educated citizenry" is misplaced. *Cf. Rivero, AFL-CIO,* 105 Cal. App. 4th at 924–25, 130 Cal. Rptr. 2d at 90 (noting that neither all unlawful workplace activity nor every allegedly improper use of public funds constitutes a public interest).

In short, while the Letter's contents conceivably affected the students and parents of SJA-Academy, the record provides little support for this argument. Such limited support, particularly in light of the two other factors, does not persuade the Court that § 1041 applies under these circumstances.

### 3. Topic of Widespread Public Interest

Finally, the Academy and KDC fail to establish that the Letter's contents involved a topic of widespread public interest.

California courts look to several factors to determine if the statement or activity precipitating the plaintiff's claim involved a topic of widespread public interest. *Wilbanks*, 121 Cal. App. 4th at 898, 17 Cal. Rptr. 3d at 506. First, a "public issue" is not an issue that the public is merely curious about. *Wilson*, 6 Cal. App. 5th at 832, 211 Cal. Rptr. 3d at 732. There "should be some degree of closeness between the challenged statements and the asserted public interest," merely alleging that the statements or actions generally interest the public is not sufficient. *Weinberg v.*

*Feisel*, 110 Cal. App. 4th 1122, 1132, 2 Cal. Rptr. 3d 385, 392 (2003) (citing *Connick v. Myers*, 461 U.S. 138, 148–49 (1983)); *see also Dual Diagnosis Treatment Ctr., Inc. v. Buschel*, 6 Cal. App. 5th 1098, 1106, 212 Cal. Rptr. 3d 75, 80 (2016) ("Almost any statement, no matter how specific, can be construed to relate to some broader topic. But, '[t]he part is not synonymous with the greater whole.'" (alteration in original) (quoting *Commonwealth Energy Corp. v. Inv'r Data Exch., Inc.*, 110 Cal. App. 4th 26, 34, 1 Cal. Rptr. 3d 390, 395 (2003)). Moreover, the ostensibly protected activity must be focused on the public issue, rather than in furtherance of a private controversy. *Weinberg*, 110 Cal. App. 4th at 1132, 22 Cal. Rptr. 3d at 392 (citing *Connick*, 461 U.S. at 148).

As described above, the Letter's contents involved an essentially private business dispute, not an issue of widespread interest. In the Letter, counsel for the Academy and KDC requested that the Governor remove or disqualify Dr. Jang from the Establishment Subcommittee. (Doc. 1-1 at 1.) This request was made to protect their financial interests and to ensure that the committee would approve SJA-Jeju, not out of concern that the public's interests would be compromised. For example, the Letter does not connect Dr. Jang's purportedly biased acts and statements to any concern for potential SJA-Jeju students or South Korean educational standards. (*Compare id.* at 2–3, §§ a–g), *with Weinberg*, 110 Cal. App. 4th at 1132, 22 Cal. Rptr. 3d at 392 (citing *Connick*, 461 U.S. at 148).

The private nature of the dispute is reinforced by the news articles in the record, which do not establish the requisite closeness between the information

contained in the Letter and the general public's interest.[17]  Only the article and

editorial published in Boston Korea suggest that the legal structure between the

Academy and KDC may be improper and that St. Johnsbury Academy's educational

quality is poor in comparison to other private schools.  (*See* Doc. 8-6 at 7.)  But the

article and editorial were written in Korean, with unknown distribution in South

Korea or Vermont, and do not mention Dr. Jang.  (*Id.*; *see also* Doc. 8 at 11.)  A single

news article alleging vague concerns about the educational quality of SJA-Jeju

cannot connect the Letter's contents to a general public interest in education.

*Weinberg*, 110 Cal. App. 4th at 1132, 2 Cal. Rptr. 3d at 392 (stating there "should be

some degree of closeness between the challenged statements and the asserted public

interest").

 For example, in *Weinberg v. Feisel*, the court also concluded that "[the]

defendant's accusations [against the plaintiff] related to what in effect was a private

matter."  *Id.* at 1127, 2 Cal. Rptr. 3d at 388.  The defendant specifically argued that,

because he accused the plaintiff of criminal activity, the matter was of public interest

under the California anti-SLAPP statute.  *Id.* at 1134, 2 Cal. Rptr. 3d at 394.  The

court disagreed, concluding that "[the defendant's] dispute with plaintiff was . . . a

private dispute between private parties" and thus, the defendant was not entitled to

the protections of the anti-SLAPP statute.  *Id.*  In particular, because no evidence in

the record connected the plaintiff to pending criminal charges or established the

general public's awareness of either the defendant's accusations or the plaintiff's

---

[17]  The Court notes that two of the articles cited by the Academy and KDC were published after the Letter was delivered and, as a result, cannot form the basis of any public dispute allegedly addressed in the Letter.  (*Compare* Doc. 1-1, *with* Docs. 8-15, 8-16.)

alleged actions, the court determined that the defendant's actions were effectively "a private campaign . . . to discredit plaintiff in the eyes of a relatively small group." *Id.* at 1135, 2 Cal. Rptr. 3d at 395. Likewise, in this case, no evidence in the record establishes the public's general knowledge of Dr. Jang's actions and statements.

In sum, because § 1041 must be narrowly construed under *Felis*, the Academy and KDC have failed to make a prima facie showing that the Letter involves a "public issue" based on precedent applying California's analogous anti-SLAPP statute. This determination, along with this Court's above decision that the record evidence is insufficient under Vermont law, compels the conclusion that the Academy and KDC have not carried their initial burden under § 1041, and their special motion to strike must be DENIED.

## III. Motion to Dismiss for Failure to State a Claim

The Court next addresses the Academy and KDC's Motion to Dismiss for Failure to State a Claim. (Doc. 11.) As set out in greater detail below, Dr. Jang fails to state a defamation claim for two reasons: (1) she has not adequately pled the elements of common law defamation under Vermont law; and (2), to the extent the First Amendment applies extraterritorially, her claim falls short of plausibly pleading that the Letter was written and published with "negligence" as to the truth. Similarly, Dr. Jang fails to state a claim for tortious interference with profession because the Complaint does not contain sufficient factual allegations for this Court to reasonably infer that the Letter contained a false statement. Thus, Dr. Jang's claims are not plausible on their face and the Academy and KDC's Joint Motion to Dismiss must be GRANTED.

46

## A. Legal Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2) (pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As detailed in *Iqbal* and *Twombly*, this does not require a plaintiff to provide "detailed factual allegations" to support his claims, *Twombly*, 550 U.S. at 555, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* In reviewing the pleadings, the court must accept factual assertions as true, but this presumption of truth "is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678; *see also Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) ("We are not . . . bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions" (internal quotation marks omitted)). In reviewing a motion to dismiss, "a court is not limited to the four corners of the complaint; a court may also consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing

suit.'" *Burton v. Lynch*, 664 F. Supp. 2d 349, 357 (S.D.N.Y. 2009) (alterations in

original) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993));

*see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("[T]he

complaint is deemed to include any written instrument attached to it as an exhibit or

any statements or documents incorporated in it by reference." (internal quotation

marks omitted)).  Finally, a complaint can be dismissed for failure to state a claim

pursuant to a Rule 12(b)(6) motion raising an affirmative defense "if the defense

appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152

F.3d 67, 74 (2d Cir. 1998).

### B.    Defamation Claim

### 1.    Elements of Defamation under Vermont Law

Under Vermont law, to make out a claim for defamation, a plaintiff must

establish the following elements:

> (1) a false and defamatory statement concerning another; (2) some
> negligence, or greater fault, in publishing the statement; (3) publication
> to at least one third person; (4) lack of privilege in the publication;
> (5) special damages, unless actionable per se; and (6) some actual harm
> so as to warrant compensatory damages.

*Lent*, 143 Vt. at 546–47, 470 A.2d at 1167–68 (footnote omitted).  This defamation

action contains both common law elements as well as constitutional limitations

imposed the United States Supreme Court.  *See, e.g.*, *New York Times Co. v.*

*Sullivan*, 376 U.S. 254 (1964).  Specifically, as noted by the Vermont Supreme Court,

the second and sixth elements were adopted after the United States Supreme Court's

holding in *Gertz*, 418 U.S. 323.  *See Lent*, 143 Vt. at 546 n.1, 470 A.2d at 1167 n.1

(citing *Gertz* for the proposition that "strict liability for all state defamation now

appears impermissible"). In contrast, the other elements of Vermont's defamation action evolved from common law. *See id.*; *see also Ryan v. Herald Ass'n, Inc.*, 152 Vt. 275, 278, 566 A.2d 1316, 1318 (1989) (stating that Vermont's current defamation law departed from common law in response to *New York Times Co*, 376 U.S. 254); *cf.* Restatement (First) of Torts § 558 (1938). Below, the Court first examines the common law elements of defamation, followed by the constitutional limitations imposed by the U.S. Supreme Court. In interpreting both the common law and constitutional elements, this Court, like the Vermont Supreme Court, looks to the Restatement (Second) of Torts for guidance. *See Skaskiw v. Vt. Agency of Agric.*, 2014 VT 133, ¶ 9, 198 Vt. 187, 112 A.3d 1277.

## 2. Common Law Elements of Defamation

As to the common law elements, Dr. Jang's Complaint does not contain sufficient factual allegations for this Court to reasonably infer either that the Letter contained a false and defamatory statement or that, in publishing the Letter, the Academy and KDC acted with the common law malice necessary to overcome their privileged communication.

### a. False and Defamatory Statement

As an initial matter, Dr. Jang's Complaint does not identify the specific false and defamatory language at issue in the Letter. Dr. Jang alleges that the Letter is "libelous and defamatory in that it maliciously claimed that the statements of [Dr. Jang] were unauthorized, disruptive and false when they were not." (Doc. 1 at 4, ¶ 30.) But this quoted language is not contained in the Letter. Consequently, the

Court is unable to determine whether certain statements are capable of being characterized as opinion or fact. *Cf. Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 720 (D. Vt. 2012) (reciting defendant's allegedly defamatory statement); *Grega v. Pettengill*, 123 F. Supp. 3d 517, 551 (D. Vt. 2015) (quoting the defendant's purportedly slanderous language). Moreover, "[v]agueness as to the complained-of conduct is particularly inappropriate when pleading a defamation claim" because "the complaint [must] afford defendant sufficient notice of the communications complained of to enable him to defend himself." *Tannerite Sports, LLC v. NBCUniversal News Grp., a div. of NBCUniversal Media, LLC*, 864 F.3d 236, 251 (2d Cir. 2017) (second alteration in original) (internal quotation marks omitted). Although the Letter is relatively brief, the Letter contains many direct statements and related inferences that could be the subject of Dr. Jang's general allegation that the Letter is libelous and defamatory. (*See* Doc. 1 at 4, ¶ 30; Doc. 1-1); *Tannerite Sports,* 864 F.3d at 251. Because Dr. Jang neither points to specific statements in the Letter nor articulates why the Letter's contents were allegedly false, (*cf.* Doc. 1 at 4, ¶ 30), she has failed to properly plead her defamation claim under federal standards. *Tannerite Sports,* 864 F.3d at 251; *see also Bloom v. Fox News of L.A.*, 528 F. Supp. 2d 69, 74 (E.D.N.Y. 2007) ("[F]ederal courts do require that the alleged defamatory statements be pleaded with sufficient specificity to put the defendants on notice." (internal quotation marks omitted)).

Moreover, even if Dr. Jang pleaded the purportedly defamatory statements with sufficient specificity, her Complaint does not plausibly allege that the Letter

contained a false and defamatory statement. Specifically, as discussed below, although the Letter's contents are actionable to the extent the mixed opinions in the Letter rely on demonstrable facts, the allegations set forth in Dr. Jang's Complaint do not credibly suggest that these contents were substantially false, as required for a common law defamation claim.

### i.      The Letter Contains Mixed Opinions

Whether a statement is opinion or fact is a question of law for the court. *Knelman*, 898 F. Supp. 2d at 720. The constitution does not protect "false statements of fact." *See Gertz*, 418 U.S. at 340. But the constitution does protect allegedly defamatory statements of pure opinion. *Knelman*, 898 F. Supp. 2d at 720. A statement is pure opinion if it is not susceptible of being proven true or false. *Id.* On the other hand, expressions of opinion may be actionable if the opinion implies that it is based on undisclosed objective facts. *See Grega*, 123 F. Supp. 3d at 551 (citing *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997)). Although these so-called "mixed opinions" are not automatically excluded as the basis for a defamation claim, *Knelman*, 898 F. Supp. 2d at 720, if a "mixed opinion" "discloses the facts on which it is based . . . , the opinion is not actionable." *Grega*, 123 F. Supp. 3d at 551 (internal quotation marks omitted); *see also* Restatement (Second) of Torts § 566 (1977).

Vermont has not adopted a test to determine whether a statement is "fact" or "opinion," but this Court has previously concluded that the following factors are relevant under Vermont law:

(1) An assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of

being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which "might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Knelman*, 898 F. Supp. 2d at 721 (citation omitted).  Accordingly, the Court examines the allegedly defamatory statements in light of the relevant factors.

As noted above, Dr. Jang's Complaint does not identify the specific false and defamatory language at issue in the Letter.  After a general review of the Letter, however, the Court concludes that the statement most closely corresponding with Dr. Jang's pleading is an opinion.  *See also Galley Schuler v. Rainforest All., Inc.*, 161 F. Supp. 3d 298, 312 (D. Vt. 2016) (reviewing attached document for false statements despite arguable failure in deficient pleading).  That statement is, "[The Academy] and KDC have deep concerns about unauthorized and disruptive actions and false statements by Dr. Soojung Jang."  (Doc. 1-1 at 1; *cf.* Doc. 1 at 4, ¶ 30.)  But this statement's use of the phrase "deep concerns" implicates the personal beliefs of the attorney representing the Academy and KDC rather than objective facts.  In the context of the Letter, this language reflects the author's strongly held opinion that Dr. Jang specifically acted to thwart the SJA-Jeju project.  For example, the Letter also opines that "Dr. Jang has waged an unjustified, concerted campaign of mistruth about SJA and KDC . . . in a transparent effort to scuttle this project," (Doc. 1-1 at 2), and argues that "[t]he campaign by Dr. Jang to impugn SJA and the integrity of its officials demonstrates her deep bias and disregard for traditional customs and laws."

(*Id.* at 3.)  Like the first statement, these statements characterize Dr. Jang's purpose and intent based on the opinions of the counsel for the Academy and KDC.  *Cf. Knelman*, 898 F. Supp. 2d at 720.  By contrast, Dr. Jang argues in her Complaint that she conducted her investigations and inquiries to benefit Jeju Solidarity and the Jeju community at large.  (Doc. 1 at 2, ¶¶ 9, 13.)  In short, these statements regarding Dr. Jang's motivations and purpose cannot be proven true or false: a community organizer in one light is a burden on development in another.

On the other hand, the characterization of Dr. Jang's conduct is based on a number of objectively verifiable events disclosed in the Letter, (*see generally* Doc. 1-1 at 2–3, §§ a–g); thus, the Letter's contents constitute "'mixed opinions' that are not per se excluded as the basis for a defamation claim."  *Cf. Knelman*, 898 F. Supp. 2d at 722.  The objectively provable incidents include Dr. Jang's allegedly unauthorized correspondence via email with Attorney Wilson, (Doc. 1-1 at 2, § a); Dr. Jang's presentation of the "Summary of Preliminary Investigation" to the committee, a presentation that the Letter claimed contained falsehoods, (*id.* § c); and Dr. Jang's assertion to the committee that Attorney Wilson was not a lawyer, which the Letter claimed was demonstrably false.  (*Id.* § d.)  Thus, to the extent that the Letter's opinions rely on demonstrable facts, the Court next considers whether the facts are false or whether the facts are substantially accurate.  *See* Restatement (Second) of Torts § 581A cmt. c(2) (stating that a defendant is not liable for basing derogatory opinion on his own statement of facts that are true and not defamatory).

## ii. Substantial Accuracy of Underlying Facts

Concluding that Dr. Jang's Complaint acknowledges the substantial accuracy of the events described in the Letter rather than refuting the underlying facts, Dr. Jang has not adequately alleged falsity in her Complaint.[18]

A defendant is not subject to liability for defamatory statements of fact if the statement is true. Restatement (Second) of Torts § 581A. In Vermont, "it is not necessary to prove the literal truth of the accusation in every detail, . . . it is sufficient to show that the imputation is substantially true, or, as it is often put, to justify the 'gist,' the 'sting,' or the 'substantial truth' of the defamation." *Weisburgh v.*

---

[18] It is not entirely clear whether "falsity" is an element in a modern defamation action under Vermont law or whether it remains an affirmative defense. At common law, although the plaintiff was required to allege falsity in the complaint, defamatory statements were presumed to be false. *See Ryan v. Herald Ass'n, Inc.*, 152 Vt. 275, 278, 566 A.2d 1316, 1318 (1989); *see also* Restatement (Second) of Torts § 581 cmt. b (1977). In other words, in Vermont, as in the majority of states, "truth" operated as an affirmative defense and the burden of proof was on the defendant to establish the truth of the allegedly defamatory statements. *Russin v. Wesson*, 2008 VT 22, ¶ 5, 183 Vt. 301, 303, 949 A.2d 1019, 1020 ("Truth is a complete defense to defamation."). Because "truth" was an affirmative defense, for pleading purposes, the defense was generally unavailable in a motion to dismiss for failure to state a claim. *See* Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1277 (3d ed. 2017) ("Since the facts necessary to establish an affirmative defense generally must be shown by matter outside the complaint, the defense technically cannot be adjudicated on a motion under Rule 12."). However, the modern trend is to treat "falsity" as a component of a defamation claim; indeed, under similar circumstances, the Second Circuit recently concluded that "falsity is an element of a defamation claim under New York law." *Tannerite Sports, LLC v. NBCUniversal News Grp., a div. of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017).

The Academy and KDC urge this Court to follow the lead of the Second Circuit in *Tannerite Sports* and conclude that "falsity" is an element of Vermont law, (*see* Doc. 11 at 10), but the Court need not decide this issue. Instead, the Court concludes that, because Dr. Jang's factual allegations in the Complaint show the presence of the affirmative defense of truth, she must allege plausible facts pointing to the Letter's falsity. *See* Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1277 ("[M]otions to dismiss or to strike only can attack matters appearing on the face of the complaint."). This conclusion is supported by the Vermont Supreme Court's decision in *Skaskiw v. Vt. Agency of Agric.*, 2014 VT 133, 198 Vt. 187, 112 A.3d 1277. In *Skaskiw*, the plaintiff brought a defamation action and the defendant moved to dismiss for failure to state a claim on the basis that the statements were privileged communication; the Vermont Supreme Court concluded that it could address the defendant's affirmative defense of privilege in a motion to dismiss because "the plaintiff's allegations in the complaint show[ed] the presence of a privilege." *Id.* ¶ 12. Here, the Court concludes that a similar rule applies to the affirmative defense of truth.

*Mahady*, 147 Vt. 70, 73, 511 A.2d 304, 306 (1986) (quoting W. Prosser & W. Keeton, The Law of Torts § 116, at 842 (5th ed. 1984)).

Here, Dr. Jang states in her Complaint that the Letter "maliciously claimed that the statements of [Dr. Jang] were unauthorized, disruptive and false when they were not." (Doc. 1 at 4, ¶ 30.) But in her Complaint, Dr. Jang acknowledges that she conducted various "investigations and inquiries" into the Academy and KDC's activities; thus, her Complaint effectively admits to the substantial truthfulness of the factual incidents described in the Letter. (Doc. 1 at 4, ¶ 29.) As she states, her investigations included seeking "clarification of [D]efendants' relationship, their control of [SJA-Jeju], and liability for any losses on behalf of [Jeju Solidarity]," (*id.* at 3, ¶ 24), requesting "records concerning the viability of the CVA, as member of POE," (*id.* ¶ 25), and pursuing "records and information." (*Id.* at 4, ¶ 27.) Dr. Jang also reiterates "that SJA or KDC have acted unfairly by failing to disclose all relevant agreement to [Jeju Solidarity] and by disseminating conflicting information about the role of SJA[,]" suggesting that she continues to believe that the Academy and KDC should provide certain records. (*Id.* ¶ 28.) Given Dr. Jang's acknowledged statements and actions, her Complaint does not plausibly demonstrate the falsity of the events described in the Letter.

Finally, to the extent that Dr. Jang argues that the Letter's contents were false because she had the authority to conduct her inquiries and investigations, her claim is contradicted by the Complaint and attached Letter. In Dr. Jang's Opposition to the Joint Motion to Dismiss, she states that her "inquiries and investigations were what her committee had authorized her to do as a committee member." (Doc. 15 at

2.)  But the Letter indicates that the committee "did not request or authorize this contact by Dr. Jang or the sharing of documents."  (Doc. 1-1 at 2, § a.)  Dr. Jang does not offer facts plausibly suggesting that this statement is false.  Moreover, even if parts of her investigation were authorized, it appears from the face of the Complaint that the gist of the Letter is true.  *See Weisburgh*, 147 Vt. at 73, 511 A.2d at 306.  In particular, as Dr. Jang admits in the Complaint, she undertook a lengthy investigation of the Academy and KDC and continually sought their business records.  (Doc. 1 at 3–4, ¶¶ 24–29).

Accordingly, Dr. Jang's Complaint fails to plead facts that, if proven, would establish that the verifiable events described in the Letter were not substantially true; instead, the face of her Complaint acknowledges the substantial accuracy of the Letter's contents.[19]

### b.    Lack of Privilege

Even if Dr. Jang's Complaint adequately pled falsity, the Complaint fails to plausibly allege that counsel for the Academy and KDC acted with the common law malice necessary to overcome counsel's privilege to communicate information intended to protect the Academy and KDC's lawful business interests.  Thus, the Motion to Dismiss must be granted on this alternative basis.

---

[19]  Given the Court's conclusion that Dr. Jang did not plausibly allege falsity in her Complaint, the Court need not consider the defamatory nature of the Letter's contents.  *See* Restatement (Second) of Torts § 581A ("One who publishes a defamatory statement of fact is not subject to liability for defamation if the statement is true.").  The Court notes, however, that Dr. Jang's allegations of professional harm from the Letter appear to plausibly show that her reputation was harmed so as to lower her in the estimation of the community and that third parties were deterred from associating with her. (*See* Doc. 1 at 4–5, ¶¶ 34–35); *see also Weisburgh*, 147 Vt. at 73, 511 A.2d at 306 (citing Restatement (Second) of Torts § 559).

Under Vermont law, a plaintiff must allege lack of privilege in the publication of the allegedly defamatory statement.[20] *Lent*, 143 Vt. at 546–47, 470 A.2d at 1168. Vermont recognizes the common law privilege to publish information to protect legitimate business interests. *Id.*; *see* Restatement (Second) of Torts § 595. Generally, this privilege conditionally protects communications made on behalf of lawful business interests "as long as the [person communicating] reasonably believes that [the] information 'affects a sufficiently important interest of the recipient or a third person' and the [person communicating] was either under a legal duty to communicate the information to the recipient or communicated the information in response to a request." *Skaskiw*, 2014 VT 133, ¶ 12 n.2 (quoting Restatement (Second) of Torts § 595). Thus, in the particular context of a lawyer's correspondence, because an attorney has a legal duty arising out of the attorney's fiduciary relationship with his or her clients, the privilege protects the attorney's honest and reasonable communications intended to protect his or her clients' business interests. Restatement (Second) of Torts § 595 cmt. f. ("[The privilege] is applicable to . . . an attorney . . . making communications . . . to a third person, if the communication is made in a reasonable effort to protect the interest that is entrusted to [the attorney by his or her clients]."). Because the privilege is conditional, however, a plaintiff may defeat the privilege with clear and convincing proof of either the attorney's or the

---

[20] As noted above, even though the absence of privilege is an element of the tort of defamation, under Vermont's pleading rules, a privilege should be "seen as an affirmative defense with the burden of proof on the defendant." *Skaskiw*, 2014 VT 133, ¶ 12. In this case, however, the Court concludes that "[Dr. Jang's] allegations in the complaint show the presence of a privilege." *Id.* As a result, Dr. Jang was required "to include in her pleadings allegations that would overcome the presence of a privilege—in this case that [the Academy and KDC] acted with malice." *Id.*

client's "common law malice."[21]  *Lent*, 143 Vt. at 546–47, 470 A.2d at 1168.  Common

law malice may be demonstrated in two ways: either "'knowledge of the statement's

falsity or with reckless disregard of its truth,' or 'conduct manifesting personal ill

will, reckless or wanton disregard of plaintiff's rights, or carried out under

circumstances evidencing insult or oppression.'"  *Crump v. P & C Food Markets, Inc.*,

154 Vt. 284, 293, 576 A.2d 441, 447 (1990) (quoting *Lent*, 143 Vt. at 549–50, 470 A.2d

at 1169–70).

Here, counsel for the Academy and KDC sent the Letter to support his clients'

legitimate business interests.  *(See generally* Doc. 1-1.)  Specifically, counsel noted in

the Letter that the Academy and KDC reasonably believed that Dr. Jang's previous

conduct and her statements could substantially affect the review and approval of

SJA-Jeju.  (*Id.* at 3.); *see Skaskiw*, 2014 VT 133, ¶ 12 n.2.  Thus, sending the Letter to

the Governor was conditionally privileged under Vermont law, absent adequate

allegations that counsel acted with common law malice.  *See Lent,* 143 Vt. at 548–49,

470 A.2d at 1167, 1169 (applying privilege to corporation that sent letter to a

prospective customer accusing the corporation's competitor of dishonesty and

incompetence); *see also Crump*, 154 Vt. at 288, 576 A.2d at 444 (applying conditional

privilege to company's internal reports and statements characterizing employee as a

thief).

---

[21]  The Court uses the term "common law malice" because, as recognized by the Vermont
Supreme Court, "common law malice" serves a different purpose from the "actual malice" standard set
forth by the Supreme Court in *New York Times Co. v. Sullivan.  See Ryan*, 152 Vt. at 281, 566 A.2d at
1320 (citing *New York Times Co.*, 376 U.S. at 280).

But adequate allegations of common law malice are not present in the Complaint. *Skaskiw*, 2014 VT 133, ¶ 12. Dr. Jang pleads only that "the Letter . . . maliciously claimed that the statements of [Dr. Jang] were . . . false" and that the Letter's "request that [Dr. Jang] be removed from the subcommittee was done willfully, wantonly, and recklessly." (Doc. 1 at 4, ¶¶ 30, 31.) From these allegations, the Court cannot infer that counsel for the Academy and KDC either knew the Letter's contents were false or acted in reckless disregard of Dr. Jang's rights, let alone that the Academy and KDC had the requisite common law malice. *Crump*, 154 Vt. at 293, 576 A.2d at 447. Simply put, bare allegations such as this are "not sufficient to defeat the conditional privilege." *Skaskiw*, 2014 VT 133, ¶ 14 (concluding that mere claims of "malice in [plaintiff's] brief" along with "counts in the complaint where [plaintiff] alleged [defendant] acted intentionally, knowingly, and recklessly" were not sufficient to defeat the motion to dismiss).

Based on the foregoing, the Academy and KDC's Motion to Dismiss must be granted because Dr. Jang's Complaint does not plausibly allege common law malice[22] sufficient to overcome the privilege to publish information to protect legitimate business interests.[23]

---

[22] Dr. Jang's failure to plausibly allege common law malice also dooms any request for punitive damages as a result of the defamation. *Cf. Crump*, 154 Vt. at 297, 576 A.2d at 449; (*see* Doc. 1 at 5.).

[23] The Academy and KDC also assert that the Letter was a privileged communication to a public official because the Letter involved "a sufficiently important public interest," which "concern[ed] matters that affected the discharge of [the official's] duties. Restatement (Second) of Torts § 598 cmt. e. As set forth in the Restatement (Second), this privilege applies to information provided to the authorities concerning crime prevention or to complaints made to the authorities about the conduct of public officials. *Id.* In this case, however, neither the Academy nor KDC point to case law suggesting that Vermont adopted or applied such a privilege at common law. As a result, the Court does not consider the arguments relating to this privilege.

### 3.     Constitutional Elements of Defamation

Even if Dr. Jang had plausibly alleged facts showing her common law defamation claim, she does not plead credible facts justifying an inference that the Academy and KDC negligently delivered the Letter to the Governor and the Establishment Subcommittee.

To satisfy the constitutional fault requirements imposed by the United States Supreme Court, a plaintiff pleading a defamation claim in Vermont must allege "some negligence, or greater fault, in publishing the statement."[24] *Lent*, 143 Vt. at 546–47 n.1, 470 A.2d at 1167, 1168 n.1 (citing *Gertz*, 418 U.S. at 347). In other words, "strict liability for all state defamation now appears impermissible" and the plaintiff must plausibly allege, at least, that the defendant negligently published the allegedly defamatory statement. *Id.*; *see also* Restatement (Second) of Torts § 580B cmt. c ("The strict liability of the common law has thus expressly been ruled unconstitutional" and "[a] significant measure of fault on the part of the defendant in regard to the falsity of the communication is required.").

Although the Vermont Supreme Court has not yet applied the negligence standard in a defamation suit, this Court has previously concluded that a defendant does not negligently publish a statement if the defendant "had reasonable grounds

---

[24] The Academy and KDC argue that Dr. Jang is a public official or public figure and that, as a result, Dr. Jang must plead facts showing that the Academy and KDC published the Letter with actual malice, a higher standard of fault than negligence. (*See* Doc. 11 at 13–17 (citing *Gertz*, 418 U.S. 323, *New York Times*, 376 U.S. 254.). As discussed above, however, Dr. Jang is not a public official or public figure. *Cf. Biro*, 963 F. Supp. 2d at 270. In any case, because the Court concludes that Dr. Jang does not plead adequate facts to allege negligence, by extension, her Complaint does not contain facts that plausibly satisfy the higher standard of fault.

for believing that the communication was true." *Stone v. Banner Pub. Corp.*, 677 F. Supp. 242, 246 (D. Vt. 1988) (citing Restatement (Second) of Torts § 580B cmt. g). In applying this standard, the core question is whether the defendant, in checking the accuracy of the purportedly defamatory statement, acted as a reasonably prudent person under the circumstances. Restatement (Second) of Torts § 580B cmt. h. Three circumstantial factors impact this inquiry: (1) the timing of the publication in relation to the topical relevance of the information; (2) the nature of the interests the defendant sought to protect; and (3) the extent of the damage to the plaintiffs if the communication proved to be false. *Stone*, 677 F. Supp. at 246.

Here, Dr. Jang's Complaint does not contain any factual assertions pointing to the Academy and KDC's negligence. Although her Complaint alleges that the Academy and KDC acted "maliciously" as well as "willfully, wantonly, and recklessly," (Doc. 1 at 4, ¶¶ 30, 31), she does not connect these conclusory allegations with any recitation of facts from which the Court can infer that the Academy and KDC negligently failed to check the accuracy of the Letter's contents. *Faber*, 648 F.3d at 104 ("We are not . . . bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." (internal quotation marks omitted)). Similarly, in Dr. Jang's Opposition to the Motion to Dismiss, she merely repeats her allegations of willful, wanton, or reckless behavior without pointing to any facts in the Complaint that this Court could accept as plausibly establishing fault. (Doc. 15 at 1.) Such conclusory pleadings are not sufficient to state a claim for defamation. *See Biro v. Condé Nast*, 807 F.3d 541, 547 (2d Cir. 2015) (concluding

that conclusory allegations of fault were not adequate to state a plausible claim for relief).

Because Dr. Jang's Complaint contains no factual allegations from which this Court can infer fault, the Motion to Dismiss must be granted on this alternative basis.

## C.     Interference with Professional Relationship

Finally, the Court addresses the assertion by Dr. Jang's counsel at the February 20 hearing that the Complaint set forth a claim for "interference with profession," (Doc. 1 at 2, ¶ 9), or "interfere[nce] with . . . professional relationship." (*Id.* at 4, ¶ 31.)  Neither cause of action is recognized in Vermont, nor does a generally recognized tort for interference with profession exist.  The closest analogs in Vermont law are "tortious interference with a contract" and "tortious interference with prospective contractual relations."  *Gifford v. Sun Data, Inc.*, 165 Vt. 611, 612–13, 686 A.2d 472, 473–74 (1996); *see also* Restatement (Second) of Torts §§ 766–766C.  To plausibly make out a claim for either tort, a plaintiff's complaint must allege that the defendant's interference was "improper."  Restatement (Second) of Torts § 766 cmt. a.  A defendant's interference is not "improper" if the defendant provides a third person with "truthful information."  *Id.* § 772(a).

Here, Dr. Jang's Complaint does not recite that the Academy and KDC's interference was "improper," let alone point to facts that elevate Dr. Jang's right to relief above a speculative level.  *Cf. Twombly*, 550 U.S. at 555.  Presumably, Dr. Jang would argue that the Academy and KDC's actions were improper based on the Letter's distribution to Governor Lee Seok-moon.  (*See generally* Doc. 1-1.)  But, as

stated above, Dr. Jang's Complaint does not contain sufficient factual allegations for this Court to reasonably infer that the Letter contained a false statement. *Cf.* Restatement (Second) of Torts § 772(a). Thus, Dr. Jang's claim for "interference with professional relationship" must be dismissed.

Accordingly, based on this determination and the Court's prior conclusions regarding Dr. Jang's defamation claim, the Academy and KDC's Joint Motion to Dismiss for Failure to State a Claim must be GRANTED. (Doc. 11.)

## Conclusion

For the foregoing reasons, the Academy and KDC's Joint Motion to Strike under 12 V.S.A. § 1041 (Doc. 8) is DENIED and the Academy and KDC's Joint Motion to Dismiss for Failure to State a Claim is GRANTED and the case is DISMISSED. (Doc. 11.) Given the Court's conclusion that Dr. Jang's Complaint must be dismissed for failure to state a claim, her Motion for Leave to File Affidavits is DENIED as moot. (Doc. 25.)

Dated at Burlington, in the District of Vermont, this 6th day of July 2018.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge